HEPP, Plaintiff, vs. PETRIE, Defendant: APPEAL OF MEISS-NER, Lien claimant.

*October 16, 1924—January 13, 1925.*

*Attorneys: Professional conduct: Supplanting lawyer in case: Canons of ethics: Infants: Control of court over fees of counsel.*

1. An infant being a ward of the court, the employment of counsel and the fees to be paid them for services rendered to minors are within the control of the court. p. 353.

2. Canons of ethics or rules governing professional conduct among attorneys, such as those adopted by the American Bar Association, embody statements of principles and rules accepted and acknowledged by reputable attorneys wherever the common law obtains, and are recognized and applied by courts in proper cases. p. 355.

3. The conduct of an attorney who, knowing a competent lawyer in good standing had been retained to represent an infant in a personal injury action, by extravagant statements as to the amount of the recovery he could secure induced the father of the minor to intrust the case to him, is censured; and after litigation which resulted in a recovery not substantially in excess of the amount the first attorney had been offered by way of settlement, the full contract fee is, under the circumstances here shown, awarded to such attorney. p. 357.

CROWNHART, J., dissents in part.

APPEAL from an order of the circuit court for Milwaukee county: JOHN J. GREGORY, Circuit Judge. *Reversed, with directions*:

From an order fixing the amount of fees which should be paid to the attorneys for the plaintiff in a personal injury action and apportioning the same, *Harry V. Meissner,* one of the attorneys, appeals.

For the appellant there was a brief by *Olwell & Brady,* attorneys, and *Harry V. Meissner, in pro. per.,* of counsel, all of Milwaukee, and oral argument by *Lawrence A. Olwell.*

For the respondent there was a brief by *Cannon, Bancroft & Waldron* of Milwaukee, and oral argument by *L. H. Bancroft.*

The following opinion was filed November 11, 1924.:

ROSENBERRY, J.   A brief statement of the facts relating to this controversy follows: On February 16, 1922, George Hepp, minor son of Adam Hepp, was struck by an automobile driven by the defendant Petrie. The boy, then five years of age, sustained severe injuries, among other things a broken leg.  Later it became infected and amputation was necessary.  The father, Adam Hepp, made inquiries at the place where he was employed as to where he could secure legal advice and was referred to *Harry V. Meissner,* a well known and reputable attorney, with considerable experience in the conduct of personal injury cases.  On March 3, 1922, Adam Hepp consulted *Mr. Meissner* and a written contract was entered into in relation to the claim of Adam Hepp and the claim of George Hepp, the minor.  The minor's contract was signed "George Hepp, by Adam Hepp, his natural guardian."   The contract was for a contingent fee, and under the terms of the contract Adam Hepp was to pay the costs and disbursements of any litigation; *Mr. Meissner* was to receive nothing for his services except in the event of recovery, when he would be entitled under each contract to twenty per cent. of the amount recovered in the event of settlement without trial and to from twenty-five to thirty-three and one-third per cent. of the amount recovered in

each action if trial should be necessary. Upon the signing
of the contract *Mr. Meissner* immediately made an investi-
gation of the case, observed the scene of the accident, and
took such steps as were necessary to fully protect and pre-
serve the rights of each, Adam Hepp and the minor, George
Hepp. The defendant Petrie carried insurance, and *Mr.
Meissner* consulted with W. W. Savage of Christ Schroeder
& Sons Company, who represented the insurance carrier.
In the month of April, 1922, infection set in, and shortly
thereafter it became necessary to amputate the leg of George
Hepp. After a number of conferences the insurance com-
pany offered to settle the controversy for $10,000. This
offer was rejected, and later an offer of $12,000 or $12,500
was made. This was in the month of April or early in May,
1922. The offer was communicated to the plaintiff, and
*Mr. Meissner* recommended that the offer be accepted.
Shortly thereafter Adam Hepp with his wife called at the
office of *Mr. Meissner* and stated that they were dissatisfied
with the offer of $12,500 because *Raymond J. Cannon,* an
attorney at law in Milwaukee and who is the respondent
upon this appeal, had told them that he could secure from
$50,000 to $75,000. Pleadings were prepared by *Mr. Meiss-
ner,* but Adam Hepp refused to proceed farther. Actions
were commenced by *Mr. Cannon,* who in the meantime had
been advised of the offer of settlement of $12,000. The
appellant gave notice of his lien, and by order of the circuit
court *Mr. Meissner's* lien in both cases was preserved. The
minor's case was tried, and resulted in a verdict of $10,000
at the end of a two days' trial. On February 12, 1924,
shortly thereafter, both cases were settled for $13,000. The
matter of the proper allowance of attorney fees was then
brought on for hearing before the court. Both *Mr. Meiss-
ner* and *Mr. Cannon* appeared at the hearing. Upon the
hearing, in addition to the facts already stated, which were
made to appear by the testimony of *Mr. Meissner,* George
Hepp, Mr. Savage, and Mr. Bendinger, who was attorney

for the insurance carrier, it further appeared that Adam Hepp came to the office of *Mr. Meissner,* informed him of the fact that his wife was dissatisfied and wished to have another attorney, and said that *Mr. Cannon* had told her that any ordinary attorney could get $25,000, but he, *Mr. Cannon,* could get $75,000. Adam Hepp testified that he was not at any time dissatisfied with *Mr. Meissner,* but that his wife wanted *Mr. Cannon.* It further appears that *Mr. Meissner,* when he learned that *Mr. Cannon* was connected with the case, proposed that they conduct the case jointly. This *Mr. Cannon* refused to do, and insisted upon conducting the case as his own and refused to have any one else share his fee with him. The contract between Mr. Hepp and *Mr. Cannon* provided that *Mr. Cannon* should receive twenty-five per cent. of the recovery. There is some controversy as to the amount offered in settlement, but it appears quite clearly that it was at least $12,000 and that it is quite probable that $12,500 could have been secured. *Mr. Cannon* was present in court when the testimony was given as to the representations made by him to Mrs. Hepp. He declined to testify when requested to do so, and the statements made must therefore be taken at their face value with all their necessary implications. The whole matter of the equitable apportionment of the fees, as well as the total amount of fee to be paid, was submitted to the court by the parties to the controversy. While the amount of the fee appears large, there is no appeal from the determination of the trial court in that respect, nor so far as the record discloses any objection thereto on the part of any one. An infant is the ward of the court, and a guardian *ad litem* is the means by which the court discharges its duty to its ward. The employment of counsel and the fees to be paid counsel for services rendered to minors are within the control of the court. *Richardson v. Tyson,* 110 Wis. 572, 583, 86 N. W. 250. The trial court found that services of the value of $3,000 had been rendered, and we do not feel war-

ranted.in disturbing that finding, especially when no attack is made upon it.

We come then to the matter of an equitable distribution of the amount allowed, and the following facts must be taken as established: (1) That *Mr. Meissner,* a reputable attorney, in good standing, fully competent to handle the matter, was properly retained by the father, Adam Hepp, to prosecute such claims as he and his minor son might have against the defendant Petrie; (2) that *Mr. Meissner* proceeded in an orderly, lawyerlike way to make the necessary investigation to preserve the evidence necessary to establish the rights of his clients, and awaited the outcome of the injuries in order that the nature of the injuries and the amount of the probable damages might be fairly disclosed before the commencement of the action; (3) that after making his investigation and after the case had sufficiently developed to indicate the probable amount of recovery, he secured an offer of settlement which was in every way advantageous to his clients and was within $500 or $1,000 of the amount finally recovered at the end of the litigation; (4) that, although he knew *Mr. Meissner* had been previously retained, *Mr. Cannon* supplanted *Mr. Meissner* as attorney in the case by the making of extravagant statements and the holding out of false and illusive hopes to the wife of Adam Hepp, and other improper methods. The exact dates do not appear, but it does appear that *Mr. Cannon* moved with expedition to secure not his clients' but his own rights by the immediate commencement of an action, and was thereby enabled to become the attorney of record. That the conduct of *Mr. Cannon* was unlawyerlike and unethical must be admitted by every one. Lawyers of the English-speaking world have from time immemorial set up certain standards and observed certain practices in their relations with one another. Violation of these established practices or a failure to adhere to the standards so set up has always been considered unprofessional conduct, and,

where moral turpitude is involved, is ground for disbarment.   See 6 Corp. Jur. p. 589, §§ 47, 52, and cases cited.

There have been numerous attempts made to formulate what may be called the unwritten or common law governing the relation of lawyers with each other.   These rules are ordinarily called Canons of Ethics, Rules Governing Professional Conduct, or some other similar title.   The latest and perhaps the most complete statement of these matters is to be found in Canons of Ethics, adopted by the American Bar Association.   It may be said here that the American Bar Association has not attempted, · nor does it attempt, to legislate for lawyers, but men learned in the law and experienced in its administration have been chosen to formulate this unwritten law and distinguish between conduct that is right and conduct that is wrong as applied to the relation of lawyers to one another.   Such authority as these canons have is derived not from the fact that they are approved by the American Bar Association but because they are statements of principles and rules accepted and acknowledged by reputable attorneys wherever the common law of England obtains, and are recognized and applied by courts in proper cases.   *Ellis v. Frawley,* 165 Wis. 381, 161 N. W. 364.

Efforts made by one person to supplant another in his lawful undertakings are condemned by all right-thinking people in every relation, and this mainly for the reason that in an effort to supplant another there is an irresistible temptation to misrepresentation, fraud, or wrongdoing of some sort.   If a merchant, by reason of the superior quality of the goods offered, draws custom from another merchant, this is not supplanting him in his lawful undertaking.   If an attorney, by reason of his superior ability or past success in the trial of cases, draws clients to himself who might otherwise go to other attorneys, this is not a supplanting of the other attorneys; but when, as in this case, an attorney, knowing another attorney to be retained, makes misstate-

ments and misrepresentations to interested parties for the purpose of securing a retainer in a case already in the hands of a brother attorney, his conduct constitutes a clear violation of the rule, which is stated in the Canons of Ethics as follows:

"Efforts, direct or indirect, in any way to encroach upon the business of another lawyer, are unworthy of those who should be brethren at the Bar; but nevertheless, it is the right of any lawyer, without fear or favor, to give proper advice to those seeking relief against unfaithful or neglectful counsel, generally after communication with the lawyer of whom the complaint is made."

Mrs. Hepp had a perfect right to express a preference for another attorney. Mr. Hepp had a right to discharge *Mr. Meissner* if he chose to do so and to retain *Mr. Cannon* if he had reasonable grounds therefor. Here it appears without dispute that the dissatisfaction of Mr. and Mrs. Hepp grew out of misrepresentations made by *Mr. Cannon* to them, and it is quite a natural inference that such representations were part of a solicitation made by the attorney to obtain the business, in violation of the rule set out in full in *Ellis v. Frawley, supra.*

*Mr. Cannon,* although advised of the very substantial offer of settlement made by the interested parties, declined to entertain any such offer and proceeded with the litigation in a manner which indicates that he was much more desirous of promoting his own interests than those of his clients. Any experienced lawyer knows that it is much better for parties to accept a just, reasonable, and substantial settlement than to enter upon litigation, the outcome of which is always at best doubtful. In addition to that, there is the element of anxiety and worry which to clients inexperienced in court matters is always serious; the delay necessarily incident to court proceedings; and there are many other considerations which induce reputable lawyers to accept substantial settlements rather than litigate doubtful cases. The

evidence in this case shows that the trial, which was no doubt prosecuted vigorously, produced at best not more than $1,000 and probably not more than $500 above the amount which could have been obtained by settlement. This doubtful advantage is offset by the interest which would have accumulated on the sum offered during the year and a half of delay; so that *Mr. Cannon* did not, although subjecting his clients to the burden of litigation, achieve a substantially different result than *Mr. Meissner* secured without resort to the courts.

The trial court evidently apportioned the fee on the basis of the amount of services rendered or time expended. While the evidence shows that *Mr. Meissner* spent some days in investigation, consultation with his clients, and in efforts to obtain a settlement, and there is very little evidence to show what was done by *Mr. Cannon* outside of the time spent upon the trial of the minor's case, we must assume, of course, that there was the necessary preparation for trial. However, we think the relative rights of the attorneys in this case are not dependent primarily upon the amount of time expended by them in this case. *Mr. Meissner* was in the case, rightfully retained in the customary way; *Mr. Cannon* was in the case wrongfully and by means of an intentional encroachment upon the rights of a brother attorney. Taking all the facts into consideration, we are of the opinion that the trial court did not properly exercise its discretion in this case; that *Mr. Meissner* is entitled to the stipulated fee. The amount which was offered in settlement we find for this purpose to be $12,000. According to the contract *Mr. Meissner* was to receive twenty per cent. of this amount in payment for his services. We think that justice requires that this amount be awarded to him out of the $3,000. No question being raised as to *Mr. Cannon's* right to the remaining $600, that amount is awarded to him. *Rubekeil v. Bowman,* 171 Wis. 128, 176 N. W. 854.

A lawyer who wrongfully intrudes himself into a case

already in the hands of another lawyer has no basis for an equitable claim. If the interest of the client had been substantially promoted and such increase could be shown to be due to the efforts of an attorney, under such circumstances other principles might be applied. There appears in this case, however, no excuse or justification for the conduct of *Mr. Cannon.* He simply went out after the business and got it by such means as were available without regard to the ethics of his profession or the rights of his brother attorney. As Mr. Chief Justice Winslow said in *Ellis v. Frawley, supra,* "Attorneys are entitled to good pay, for their work is hard, but they are not entitled to fly the black flag of piracy." By his failure to offer any explanation or in any way to justify his conduct in this case, he has admitted there is none, and upon the record he stands condemned by his own admission.

There are not wanting signs that the taint of commercialism which has reached other professions has likewise laid its blighting hand upon the profession of the law. In a time when the emphasis in our national life is upon production and distribution, it is perhaps not strange that men should enter the legal profession who regard it merely as a trade or means of livelihood or of accumulating a fortune. It is not necessary to descant upon the glories of the legal profession, but any lawyer who has no other ideal than that of making money in the practice of his profession is almost certain to go wrong.

Confidence in the courts is a necessary and indispensable factor in our national life. Those who administer the courts are drawn from the legal profession, and it is imperative that that profession maintain its ideals. If the profession is to become a mere band of traders with no other thought than merchandising legal training and ability, our institutions cannot long maintain their present level. It is, however, proper to say that there are comparatively few men engaged in the practice of law who do not adhere with

scrupulous exactness to the high standards and the fine ideals of the legal profession, and in this connection we quote the words of the late Mr. Chief Justice WINSLOW, who did as much perhaps as any other one man has ever done in this state in building up professional ideals. He said:

"It is one thing to enter a *business* with the idea of gaining a livelihood or acquiring wealth thereby; this is perfectly honest and legitimate, but it is in no sense ennobling. It is quite another thing to enter a *profession* with the conviction that it is charged with the great public duty of administering justice, and that its leaders in the past have swayed the minds of their fellow citizens in the greatest affairs of life and led democracy's battle wherever waged; this thought is inspiring, it involves a consecration to duty, a conception of the lawyer's work not as mere money getting but as service of the highest order, not as a mere occupation, but as a ministry."

Mr. Chief Justice RYAN said:

"This is the true ambition of a lawyer: To obey God in the service of society; to fulfil His law in the order of society; to promote His order in the subordination of society to its own law, adopted under His authority; to minister to His justice, by the nearest approach to it, under the municipal law, which human intelligence and conscience can accomplish. To serve man, by diligent study and true counsel of the municipal law; to aid in solving the questions and guiding the business of society, according to the law; to fulfil his allotted part in protecting society and its members against wrong, in enforcing all rights and redressing all wrongs; and to answer, before God and man, according to the scope of his office and duty for the true and just administration of the municipal law."

Daniel Webster said:

"Justice is the greatest interest of man on earth. It is the ligature which holds civilized beings and civilized nations together. Wherever its temple stands, and so long as it is honored, there is a foundation for social security, gen-

eral happiness and the improvement and progress of our race. And whoever labors upon this edifice with usefulness and distinction, whoever clears its foundations, strengthens its pillars, adorns its entablatures, or contributes to raise its august dome still higher to the skies, links himself in name, fame and character with that which is, and must be, as durable as the frame of human society."

These are high ideals and noble sentiments. There are not wanting, in these times of unrest and change, many cynics who are willing to scoff at what they deem to be unrealities and who ignore, if they do not despise, spiritual values. However, it must not be forgotten that the foundations of our government were laid by men who were devoted to principles and ideals and that upon these principles and ideals our national success has been builded. If we are to maintain ourselves we must maintain our ideals. No nation has ever become great through material things alone. It is when people have been willing to sacrifice unstintingly for their principles and their ideals that nations have experienced their greatest advance, and a particular and peculiar responsibility rests upon the Bar and the Bench of this country, and any conduct which tends to lower the standards and corrupt the ideals of the Bar or to destroy the confidence of the public in the legal profession should meet with the most emphatic disapproval and reprimand from all right-thinking members of the profession, and particularly from the courts.

The members of the legal profession are not alone in their appreciation of the necessity for maintaining its high standards. In 1909 the legislature, by ch. 179, required that every person admitted to practice law in this state should take an oath in open court. It is as follows:

"Section 2586a. Each person admitted to practice as a member of the bar of any court of this state shall subscribe the roll of attorneys to be kept by the clerk and shall in open court take an oath or affirmation of the tenor following, to wit:

"I do solemnly swear:

"I will support the constitution of the United States and the constitution of the state of Wisconsin;

"I will maintain the respect due to courts of justice and judicial officers;

"I will not counsel or maintain any suit or proceeding which shall appear to me to be unjust, or any defense, except such as I believe to be honestly debatable under the law of the land;

"I will employ, for the purpose of maintaining the causes confided to me, such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by any artifice or false statement of fact or law.

"I will maintain the confidence and preserve inviolate the secrets of my client and will accept no compensation in connection with his business except from him or with his knowledge and approval.

"I will abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged;

"I will never reject, from any consideration personal to myself, the cause of the defenseless or oppressed, or delay any man's cause for lucre or malice. So help me God."

The substance of the oath relates to the relations of an attorney to the United States, to the state of Wisconsin, to the courts, and to his clients, and itself lays down ethical precepts of the highest order. While attorneys are not public officers, they are, as Mr. Chief Justice RYAN said in *In re Mosness*, 39 Wis. 509, *"quasi*-officers of the state, whose justice is administered by the court."

The conduct complained of in this case certainly is not in accord with the ethical standards prescribed by the oath. An attorney who violates this oath or the ethical rules established in the profession may appear to succeed for a time, but any success which is not built upon honor and integrity is ephemeral and fleeting. An attorney may ignore or flout established professional standards. He will not thereby weaken the validity of the Code nor impair its sanctions,

but he will declare the moral plane upon which he proposes to move.   An apparent success which is purchased by the sacrifice of principles and ideals is not worth having.   Conduct of the sort here under consideration cannot be allowed to pass unnoticed.   The demeanor of the respondent in this case indicates an indifference, almost a contempt, for established professional standards.   His sole anxiety seemed to be to get a fee as large as possible and to secure that he was willing to subject his client's interest to the hazard of litigation simply to make good his boast, and by means of misrepresentation to supplant a brother attorney.   It is possible there are extenuating circumstances, but, if so, none appear of record.   It is to be hoped that occasions for censure of this sort will not often arise.

*By the Court.*—The order appealed from is reversed, with directions to allow the appellant *Meissner* the sum of $2,400 and to the respondent *Raymond Cannon* the sum of $600.

The following opinion was filed November 24, 1924:

CROWNHART, J. (*dissenting in part*).   This appeal involves a contest between two attorneys over fees to be charged as liens on two judgments recovered in personal injury actions in the circuit court for Milwaukee county, JOHN J. GREGORY, Circuit Judge.   One judgment is for $3,000 in favor of the father of an infant son for loss of service and expense incurred by reason of accidental injury to the infant, and one judgment is for $10,000 in favor of the infant for his damages occasioned by such injury.   The circuit court allowed the claim of Attorney *Meissner* at $500 and of Attorney *Cannon* at $2,500, both constituting liens on the judgments in proportion to the respective amounts of the judgments.   From this order of the court Attorney *Meissner* appeals.

The facts are stated in the majority opinion, but I think they need further elucidation. The father consulted Attorney *Meissner* for advice about the injury to his infant son, five years of age, and this consultation resulted in a purported contract between *Meissner* and the father for the employment of the attorney to represent the father in actions to recover damages for both the father and the infant. The contract was drawn by *Meissner*. It represents the father as the guardian of the son, but it is conceded that he had no appointment as such. The father, therefore, could only bind himself by such contract, and the infant was not bound. In the contract the father does not purport to bind himself in the cause of his son.

*Meissner* made some investigations with reference to the causes of action, and had some conferences with insurance representatives about a settlement. But before any guardian was appointed for the infant, or any action commenced, or any settlement was made, the father discharged Attorney *Meissner,* and Attorney *Cannon* was employed instead. Thereupon Attorney *Meissner* gave notice of claim for lien on the causes of action pursuant to sec. 2591*a,* Stats. *Cannon* prosecuted the actions to judgments, whereupon *Meissner* applied to the court to have his fees determined and his lien declared, under the statute cited, with the result above stated.

Now this court holds that Attorney *Cannon* secured his retainer by fraud and professional misconduct, and in that I concur. The legal consequences of such misconduct should follow. *Cannon* should have no aid from this court or the circuit court to recover any fee whatever. So I cannot concur in so much of the decision as awards Attorney *Cannon* $600, and makes it a lien on the judgments.

As to award of Attorney *Meissner: Mr. Meissner* testified that no guardian was appointed for the minor. His contract was only with the father. That being so, he must

look only to the father for his fees.  The trial court was without jurisdiction to make any part of his claim a lien on the judgment of the infant.  No such lien existed at common law, and no such lien exists under the statute except by virtue of a valid contract with the infant, which could only be made by the infant through his duly appointed guardian.  I therefore do not concur in the majority opinion which allows *Mr. Meissner's* claim against the infant. Under sec. 2591*a*, Stats., a lien is given where the contract so provides and not otherwise.  The contract between Hepp and *Meissner*, which is before us, does not contain any agreement that *Meissner's* services are to be secured by lien on the causes of action.  He therefore had no statutory lien, and the court was without jurisdiction to enter an order therefor.

Further, I am impelled to dissent from the decision of the court which increases the allowance of *Mr. Meissner* from $500 to $2,400.  The circuit court took evidence on the subject, and he had heard the trial of both cases.  He was competent to judge fairly, and I think he did judge fairly, the amount *Mr. Meissner* had earned.  *Mr. Meissner* testified that the services he rendered took about four and one-half days.  These were mostly office conferences, and I think this court cannot say that the trial court acted against the clear preponderance of the evidence when he allowed *Mr. Meissner* more than $100 per day.  It must be remembered that *Mr. Meissner* was entitled only to the value of his services, so far as the minor was concerned, if at all, on the basis of *quantum meruit*.  The trial court was permitted to apply his own knowledge as to the reasonable value of the services rendered.  *Rubekeil v. Bowman,* 171 Wis. 128, 176 N. W. 854.

I think this court has gone entirely beyond the evidence in allowing *Mr. Meissner* such a large award.  It is only justice to *Mr. Meissner* to say that he did not make claim to any such sum.  He stated all the facts fairly to the trial court and left it to the court to fix the award.  When asked

by the trial court to state the value of his services he did not do so.

Courts guard the interests of infants with jealous care. I do not think that has been done in this case. The quarrel between the attorneys, and the subject of professional ethics, have so absorbed the attention of the court that the interest of the infant has been overlooked.

I therefore dissent.

The respondent moved for a rehearing.

In support of the motion there was a brief by *Roehr & Steinmetz* of Milwaukee.

In opposition thereto there was a brief by *Olwell & Brady,* attorneys, and *Harry V. Meissner, in pro. per.,* of counsel, and memoranda by *Lawrence A. Olwell* of Milwaukee, requesting modification of the opinion and judgment of the court.

The motion was denied, with $25 costs, on January 13, 1925.