STATE, Plaintiff, vs. CANNON, Defendant.

*May 4—July 5, 1929.*

*Spencer Haven* of Hudson, special counsel, for the plaintiff.

*W. A. Hayes* of Milwaukee and *Henry Lockney* of Waukesha, for the defendant.

STEVENS, J. The power to protect courts and the public from the official ministration of persons unfit for practice in them was fully established in the former decision of the court in this case, *State v. Cannon,* 196 Wis. 534, 221 N. W. 603, where it was held that when the people by means of the constitution established courts, they became endowed with all judicial powers essential to carry out the judicial functions delegated to them. The courts established by the constitution have the powers which are incidental to or which inhere in judicial bodies, unless those powers are expressly limited by the constitution. But the constitution makes no attempt to catalogue the powers granted. It is the groundwork upon which the superstructure of government is raised by the exercise of those powers which are essential to carry out the functions imposed upon each department of government. These powers are known as incidental, implied, or inherent powers, all of which terms are used to describe those powers which must necessarily be used by the various departments of government in order that they may efficiently perform the functions imposed upon them by the people.

It is essential to the administration of justice by the courts that they should be aided by members of the bar, who are "*quasi*-officers of the state whose justice is administered by the court." *In re Mosness,* 39 Wis. 509, 510. The bar is as essential as the bench. "It is very important to the people and the court that the standard of admission to the place and retention thereof should be as high as practicable in law, and maintained as high as practicable in fact. Much power in that regard is vested in the court by the constitution, incidental to its possession of judicial power and its duty to enforce, through careful administration, legislative tests of eligibility." *Vernon County Bar Asso. v. McKibbin,* 153 Wis. 350, 352, 141 N. W. 283.

But the courts are not powerless, in the absence of legislative tests of eligibility, to protect themselves, and the people whom they serve, from those members of the bar whose conduct has been such as to forfeit their right to longer act as ministers of justice in the courts. "It is well settled that a court authorized to admit an attorney has inherent jurisdiction to suspend or disbar him for sufficient cause, and that such jurisdiction does not necessarily depend on any express constitutional provision or statutory enactment." 6 Corp. Jur. p. 580. Cases from most jurisdictions of the United States are cited in Corpus Juris to sustain this proposition.

The courts of Wisconsin frequently exercised this inherent power before the enactment of ch. 84, Laws of 1903, which was the first legislative act upon the subject of disbarment in Wisconsin. When the people framed the constitution creating courts those judicial tribunals were endowed with the inherent power to admit and disbar attorneys,—a power which was generally exercised by courts at the time the constitution was framed and generally recognized as one of the powers essential to the performance of the judicial duties imposed upon courts. The nature and effect of the acts of

which the referee found the defendant guilty were not changed by the adoption of the amendment to sec. 256.29 of the Statutes, which was passed in 1927. These acts constituted grounds for disbarment prior to the enactment of this statute.

The record presents something of the life history of a man who has won for himself an education and a place at the bar. His counsel admit that he has made mistakes that may subject him to criticism, but they urge that he should not be held accountable for these mistakes to the same degree as if he had enjoyed larger opportunities as a boy and had not been compelled to fight his way, moved at all times by the instinct of self-preservation. The achievements of those who win place for themselves by their own unaided efforts always deserve commendation. But the right of a lawyer to maintain his place at the bar must be determined by his conduct as a minister of justice, not by his early struggles for an education. The public has a right to be protected from the unfit practitioner, without regard to whether he was required to struggle against adversity or was reared in the lap of luxury.

Defendant's habit of meeting and overcoming all obstacles that were encountered by him explains, but does not justify, the acts and course of conduct of which the referee found the defendant guilty. A reading and study of the entire record satisfies the court that the findings of the referee upon which the court bases its conclusions are supported by the great weight of the evidence of witnesses who appear to have no interest in the controversy. Some of their testimony is contradicted by the defendant and by those associated with him, although there is much to support these findings in the testimony of the defendant and of his witnesses.

The record discloses the defendant as a man whose purpose it was to let nothing stand in the way of making his profession yield him the largest possible financial return,

without regard to the established canons of professional conduct. To accomplish that end the referee found that he began the Huelse suit without authority from the injured man; that he improperly displaced attorneys previously retained; that he purposely and knowingly misled and deceived courts; that he collected excessive, exorbitant, and unconscionable fees from his clients, and that he commercialized his profession by the organized solicitation of business.

In the Adams case the defendant secured the approval of a settlement of a case brought by a minor by suppressing the fact that he was charging $4,200 for his services, under a contingent thirty-three and one-third per cent. contract, for compromising that case without a trial, thereby misleading and deceiving the court into approving the settlement. When the facts were subsequently disclosed to the court, the defendant refunded $1,700 of the fee retained by him.

In the Dr. Wright case he exacted a retainer of $750 and demanded an agreement for the payment of $1,000 additional if the doctor's license to practice medicine was not canceled,—a result which could be accomplished only by subverting plain statutory requirements. It could not be accomplished by the exercise of professional knowledge or skill. It could be attained only by what may be described as lobbying methods. It may be conceded that negotiations with a district attorney looking towards a recommendation of leniency in case of a plea of guilty are proper where the penalty imposed is within the law. However, where the penalty imposed as the result of such negotiations is not within the law, but is contrary to the express provisions of the law, the whole transaction is tainted with suspicion.

The words of Chief Justice RYAN, speaking for this court with reference to an analogous question, aptly characterizes the conduct of the defendant in this matter: "Any agreement of the character here in question . . . between a public prosecutor and the attorney of the defendant in an indictment is

. . a bargain for judicial action and judgment; hardly, if at all, distinguishable in principle from a direct sale of justice. . . . The profession of the law is not one of indirection, circumvention, or intrigue. . . . The duty imposed by professional retainer is direct and open. Professional function is exercised in the sight of the world. . . . Professional weapons are wielded only in open contest. No weapon is professional which strikes in the dark. . . . A lawyer may openly, upon open retainer, advocate his client's cause, however bad, and be within the function of his profession. But a lawyer who otherwise uses personal or professional influence to bend justice in favor of his client; who uses any influence for his client upon the administration of justice, except open professional service and advocacy; who seeks by device or intrigue advantage for his client in litigation, is outside of professional duty and function." *Wight v. Rindskopf,* 43 Wis. 344, 354, 356–7.

Where an attorney charges for such a result,—a result which circumvents the law, a result which in no manner depends upon professional services, a result which cannot be attained without connivance with or misleading public officials,—it reveals a character far beneath the standard required of ministers of justice.

Another incident that demonstrates that the defendant did not permit either the law or the orders of courts to stand in the way of the accomplishment of his purpose is found in the case in which he was adjudged guilty of contempt. The courts had twice denied him the right to examine a witness in a highly sensational case that attracted much newspaper attention. In defiance of these court orders he procured a court commissioner, a court reporter, and a battery of newspaper men, including a photographer, and proceeded as if taking a deposition in order that the same might be exploited in the newspapers and incidentally that it might advertise him. No early struggle against adversity can justify

one, and especially a member of the legal profession, in subverting the law or in acting in open defiance of the mandates of courts.

Defendant admitted that he had been engaged in ambulance chasing. For some reason not satisfactorily explained in the evidence a great many phone calls came into his office notifying the office of the occurrence of accidents. By a regular system of office routine these calls were transferred to cards which were placed on a spindle and referred to an "investigator" who was employed at a salary of $250 and $300 a month. The duties of this "investigator" are best described in his own words, when he testified that he went to investigate whenever "any report or call came to the office that there was a case, of course probably we wouldn't know whether it was a personal injury case or criminal case, or anything; I would go out and talk to the people, get all the information, and arrange for them to later come to the office, or, if they were unable to come to the office, I would make arrangements to bring Mr. Cannon there." This "investigator" recommended the employment of the defendant. In many cases he called the defendant to the bedside of the injured person. In some cases he secured contracts without having the prospective client meet the defendant.

One undertaker testified that he had several times recommended the defendant to persons who came to his establishment after members of their families had lost their lives in accidents. There is no suggestion that the undertaker's interest in the defendant arose out of any previous employment of the defendant by him. In fact there is no explanation of this solicitude on the part of the undertaker in securing clients for the defendant. In one case in which the undertaker called the defendant to his establishment, the defendant personally solicited the case while caskets were being selected and he had the contingent-fee contract signed before the funeral was held. Persons in other walks of life who

knew of the happening of accidents were for some reason solicitous to secure clients for the defendant. In some way word would come to the defendant's office that injured persons had been taken to hospitals. Defendant's "investigator" would visit them at the hospitals. In most cases this visit would be followed by the making of a contingent-fee contract by which defendant would be retained to represent the person visited.

In fourteen years of practice the defendant testified that he had tried from 700 to 900 cases. It also appears that he settled many actions. It is apparent that such a large number of retainers during his earlier years of practice could not be due entirely to the fact that former clients recommended him to their friends. One cannot read the record without being compelled to come to the conclusion that defendant had perfected and used a very efficient organization for the solicitation of negligence and criminal cases. This practice has been justly characterized by this court as "the most abominable and offensive professional misconduct." *State v. Kiefer,* 197 Wis. 524, 528, 222 N. W. 795, 796. It is a practice to which "no reputable attorney in this state or elsewhere will resort." *Chicago, M. & St. P. R. Co. v. McGinley,* 175 Wis. 565, 579, 185 N. W. 218.

Again it may explain, but it cannot justify, defendant's participation in this "abominable and offensive professional misconduct," that it was indulged in by others without legislative or judicial criticism for some years. That fact was considered in fixing the penalty imposed in the *Kiefer Case* and has been given consideration in determining what shall be the judgment in this case.

But this case is distinguished from the *Kiefer Case* by the fact that the defendant in that case had demonstrated by his conduct that he was "fully convinced of the unpro-

fessional conduct involved in these practices." The court was satisfied that the defendant in that case would not again resort to these unprofessional practices. The court therefore concluded that a suspension of the license to practice was "not necessary to give time for reformation of the defendant." *State v. Kiefer*, 197 Wis. 524, 530, 222 N. W. 795, 797.

In the case at bar, on the contrary, the past conduct of the defendant has not been such as to give any assurance that he will change his method of practicing his profession without something more potent than judicial criticism to aid in effecting such reformation. Nearly a half decade ago conduct on the part of the defendant which was similar to that found by the referee was severely criticised by this court in *Hepp v. Petrie*, 185 Wis. 350, 200 N. W. 857. But that criticism does not seem to have impressed the defendant with the necessity of changing his methods of practicing law, because every case in which his conduct is here subjected to criticism, except two, arose after the announcement of that decision.

The referee found that the defendant charged unconscionable and excessive fees. The defendant justified the retention of such fees by the fact that they were fixed by the terms of his standard contingent-fee contract for thirty-three and one-third per cent. of the amount recovered. He enforced these contracts to the penny, so far as the record discloses, without regard to the amount of service performed or the needs of the client. Both the statute, sec. 256.36 of the Statutes, and the common law recognize the validity of contingent-fee contracts. But recovery of fees under such contracts is limited to those that are fair and reasonable. Fees that are oppressive or extortionate are never upheld. Applying this well established rule, the circuit court directed the defendant to refund approximately forty per

cent. of the fee retained by him in the Adams case. In any view that can be taken of the Erickson case, the retention of a fee of $6,666.66 for negotiating a settlement of that action was properly held by the referee to be unconscionable in amount. A consideration of the contracts made by the defendant, as well as of the services performed and the fees charged, leads to the conclusion, expressed when the defendant's conduct was under review in an earlier case, that "his sole anxiety seemed to be to get a fee as large as possible." *Hepp v. Petrie,* 185 Wis. 350, 362, 200 N. W. 857.

"Attorneys are entitled to good pay, for their work is hard, but they are not entitled to fly the black flag of piracy. Such contracts as are here in question tend to make the lawyer forget his high duty as a minister of justice and to convert him into a mere grubber for money in the muckheaps of the world." *Ellis v. Frawley,* 165 Wis. 381, 385, 161 N. W. 364.

The defendant's course of conduct as briefly outlined in this opinion shows that he had not recognized that "the practice of the law is not a trade, but a ministry." *Ellis v. Frawley,* 165 Wis. 381, 383, 161 N. W. 364. It is as true today as it was a half century ago when Chief Justice RYAN said in his address before the graduates of the University law school that "the pursuit of the legal profession for the mere wages of life is a mistake alike of the means and the end. It is a total failure of appreciation of the character of the profession."

The case presents the record of one licensed to practice law who is no longer entitled to commendation to the public as a member of that honorable profession. By the course of conduct pursued by him he has forfeited his right to practice the profession of the law, until such time as he is willing to re-enter it " 'with the conviction that it is charged

with the great public duty of administering justice'" and with "'a conception of the lawyer's work not as mere money-getting, but as service of the highest order, not as a mere occupation, but as a ministry.'" *Hepp v. Petrie,* 185 Wis. 350, 359, 200 N. W. 857.

The referee is a lawyer of long experience at the bar in Wisconsin. He is a man of high professional ideals. He had the advantage of seeing the witnesses and of observing the conduct of the defendant throughout a long trial. He has recommended suspension of the license to practice law for two years. While the conduct of the defendant is such that a more severe judgment would be justifiable, the court believes that under the facts disclosed by the record the license to practice should not be definitely suspended for a period exceeding two years.

*By the Court.*—It is ordered and adjudged that the defendant, Raymond J. Cannon, repay to the state treasury, within sixty days after they are taxed, the state's witness fees, the reporter's fees and expenses, the clerk's fees, the sheriff's fees, and the referee's fees and expenses, said sums to be taxed by the clerk of this court as costs are taxed in actions in this court.

It is further ordered and adjudged that said Raymond J. Cannon be suspended from the practice of law until June 30, 1931, and for such period thereafter as shall expire before his license to practice law is restored and he is reinstated as a member of the bar by this court, upon the presentation of proof that the expenses of this proceeding have been paid, and upon the further condition that he shall, before being reinstated, satisfy the court both by his conduct from this time forward and by assurances then given the court that he will not, if reinstated, be guilty of such conduct as that involved in the charges made in the complaint in this action.

CROWNHART, J. (*dissenting in part*). By statute the court is clothed with great power to discipline attorneys. It appoints a board to make complaint; it appoints attorneys to prosecute; it appoints a referee to take testimony; it passes final judgment which may ruin a lawyer in his profession and practice. In this case this great power has been exercised and solemn judgment entered which works the inevitable ruin of an attorney with an established practice which has taken him the best years of his life to acquire, and there is no discussion of the evidence upon which the judgment is based. The complaint here is based upon the evidence taken on the inquisition had upon the "Churchill Petition." See *State ex rel. Reynolds v. Circuit Court,* 193 Wis. 132, 214 N. W. 396. The counsel for the State freely admits that he had the full co-operation of the counsel for the defendant in the production of the evidence on the hearing. We may safely assume that no pertinent facts have been suppressed. The record contains 1,000 pages of evidence and numerous exhibits. I have examined the evidence with much care, and it is because I feel that it does not justify the judgment that I am impelled to dissent.

The court sums up the findings of the referee as follows: "The referee found that he [Cannon] began the Huelse suit without authority from the injured man; that he improperly displaced attorneys previously retained; that he purposely and knowingly misled and deceived courts; that he collected excessive, exorbitant, and unconscionable fees from his clients; and that he commercialized his profession by the organized solicitation of business." I consider such findings in order:

*Huelse case:* The Huelse matter, if true, is too trivial for serious consideration in a disbarment proceeding. At its worst, the action was commenced through a misunderstanding and was promptly dismissed, without charge, upon objection of Huelse to its continuation.

*Displacing attorneys:* Only two charges were made against Cannon as to displacing attorneys. The first was as to displacing attorney Bennett in the Wright case. I can find no evidence whatever of wrongful conduct on the part of Cannon in this matter. I quote from Bennett's testimony:

"I think it [telephone conversation] was something like the letter, that Dr. Wright wanted to retain him, and he wanted to know if I had been paid, settled up, and I think I told him that I had not been paid or settled up with at that time, but that didn't make any difference, if Dr. Wright wanted him to represent him, why that was all right, to go right ahead; that is my recollection."

Not only did Mr. Bennett expressly authorize Mr. Cannon to "go ahead," but Mr. Cannon required the doctor to pay Bennett before he would go on with the case. Cannon did not solicit the case. On the contrary, Wright came to his office and sought to employ him.

The second charge relates to displacing attorney Lenicheck in the Adams case. Here, too, the evidence is conclusive of no wrong on the part of Cannon. Cannon was substituted for Lenicheck in the Adams case by mutual arrangement between them. I quote from the testimony of Lenicheck:

"Q. There was no friction whatever then between you and Mr. Cannon? A. None whatsoever.

"Q. And when you received from Mr. Cannon the check for $400 you felt well compensated and well treated, didn't you? A. I admit I was.

"Q. That is all. A. And I so testified."

*Misleading courts:* Only two charges are made against Cannon on this score. The first relates to the Wright case, dating back to 1922. A doctor was charged with an illegal abortion. He pleaded guilty on the advice of Cannon. Cannon had taken the matter up with the district attorney, who agreed that if a plea of guilty was entered he would not

insist upon the revocation of the doctor's license as provided by statute. It is quite a general practice for the State's attorneys to recommend moderation in punishment for first offenses if the party charged will plead guilty. It is a commendable practice. Possibly the district attorney waived the strict letter of the law, and probably he did so for what to him seemed a good reason. His proof may have been doubtful and conviction uncertain. But was the court deceived? The court is presumed to know the law. The judge was not called as a witness in this proceeding. He does not testify that he was deceived. There is not a word in the record that he was deceived. The fee of defendant was $1,069 instead of $1,750, as stated in the opinion.

The second charge is that Cannon deceived the court as to his fees in the Adams case. There the question before the court was the amount to be awarded a minor out of a lump-sum settlement of two personal injury cases—one for the father and one for the minor—for $12,500. The father, Mr. Cannon, and the attorney for the defendant appeared before the circuit court, fully explained the terms of the settlement. The father testified that he agreed that the minor be allowed out of the settlement the sum of $7,000, net, and that he would pay all charges and expenses out of the balance of the amount of the settlement. He testified he fully understood the situation and was entirely satisfied. All parties were ready and willing to answer any inquiries of the court. The court asked a few questions, which were answered fairly, and then it approved the settlement. No questions were asked as to Mr. Cannon's contract with the father and that matter was not before the court for consideration. Cannon had the usual and customary contract of one third of the amount of the net recovery. The court could not have been ignorant of the customary fee in such cases. The father was an intelligent business man fully capable of contracting. There is no proof of any deception practiced upon the court. The judge did not testify that

he was deceived or misled in any manner. This court in its opinion draws an invidious inference against Cannon from the fact that he afterwards refunded $1,700 from his fees, upon an order of the court. I think it was greatly to Mr. Cannon's credit that he did so. He was cited by the court to appear and make further explanation, and did so. He frankly consented to submit to any order the court might make. Clearly the court had no right otherwise to change the terms of the contract between Mr. Cannon and the father. The father had made no complaint.

*Collection of exorbitant fees:* Only in two cases is it charged that defendant collected exorbitant fees. In each case he collected his fee as provided in a contingent-fee contract which was legal when made, and the only claim that the fee was exorbitant is based upon the fact of a very favorable settlement. True, the fee seems large in view of the amount of the settlement. But such conclusion ignores entirely the basis of contingent-fee contracts. Every lawyer of experience knows, and presumably every judge knows, that contingent-fee contracts must be sufficient to *average* a reasonable fee. In a majority of the contingent-fee cases that come to a lawyer he gets no compensation whatever. In many others he gets insufficient compensation. In a comparatively few cases he gets a large fee because of the fortunate outcome of the case. But on the whole, a thirty-three and one-third per cent. contingent-fee contract is entirely reasonable both as to the client and the attorney, and has often been so recognized by the courts. To my mind it is wholly unjust to pick out of hundreds of cases, two or three where the attorneys, and clients as well, were fortunate in making a good settlement, and ignore the many more cases where the attorney unfortunately labors hard and long without any compensation.

The court in its opinion says: "Cannon enforced these contracts to the penny so far as the record discloses." But the record does disclose that Mr. Cannon was loyal to his

clients, and not a single complaining client appeared against him in this proceeding. Further, the record discloses on the part of defendant a consent, voluntarily made, to reduce his legal, contractual fee in the Adams case by refunding $1,700. The record also discloses in the Lobenhoefer case, where the railroad company defendant proposed to the Lobenhoefers to make a settlement directly with them and leave Mr. Cannon out of consideration, that Mr. Cannon, after rendering the Lobenhoefers very valuable services, released them from their contract entirely and made no charge against them. I think it is a great compliment to Mr. Cannon that it appears that out of all the cases that he had in his practice not one client came forward to claim that he was overcharged a single penny, and especially so after Mr. Cannon's practice was subjected to a searching inquisition accompanied by widespread newspaper notoriety.

The court criticises the defendant for his conduct in a case in which, way back in 1921, he paid the full penalty for his indiscretion. That matter was not charged in the complaint and had no place in the record. In that case Mr. Cannon did not violate any order of court. He attempted to take an affidavit, which he had a right to take, but because the court found that his purpose was to interfere by undue publicity with the course of justice, he should be held in contempt of court. He was so held, and fined $50, which he paid, and that should have been the end of that matter. On the other hand, thirteen judges of courts in which Mr. Cannon had practiced testified before the referee that Mr. Cannon was respectful to the court, courteous to his opponent, considerate with the witnesses, fair and within legitimate bounds in his arguments to the jury, exhibited loyalty to his clients, and displayed ability in the management of his cases. No one testified to the contrary. Besides, Judge Shaughnessy, who was district attorney and assistant district attorney from 1919 to 1924, testified that he

observed the comportment of Mr. Cannon in connection with criminal cases, and found it unobjectionable.

*Solicitation:* The referee found that Cannon, by himself and through one Busch, solicited business, and the testimony justifies the finding. However, it does not justify a finding of any widespread or extensive solicitation or of any of the objectionable methods practiced in the *Kiefer Case* (*State v. Kiefer,* 197 Wis. 524, 222 N. W. 795). Cannon used no advertising matter, he divided no fees with any one not an attorney, and neither he nor Busch was particularly aggressive in solicitation. Only very few cases are shown by the evidence to have been solicited by either Cannon or Busch. The opinion of the court contains many strong and sweeping statements which I think are not sustained by the evidence, and which it is not necessary to enumerate.

I have been unable to find a single case where any court at any time has disbarred an attorney for mere solicitation of business in the manner here shown, in the absence of a statute making solicitation a disbarrable offense. This court disbarred Kiefer because he not only solicited business, but in effect went into partnership with a layman in the personal injury business, dividing the proceeds equally between them. Kiefer was acquitted of the charge of taking excessive fees, although in one case he took a fifty per cent. fee from a most unfortunate victim of an accident.

Mr. Cannon is a married man with three children, aged, respectively, six, eight, and eleven years. He is thirty-six years old. He had a hard life in childhood and early manhood. He made the most of his opportunities, educated himself, and was admitted to the bar. He lacks in cultural training and polish. But he seems to have a rugged honesty that has procured for him a host of friends among the common people who have trusted him, and still do. It does not appear that he has ever betrayed that trust. He has made

some mistakes and he has paid the penalty therefor. He fights hard for his clients—mostly poor people—and he seems to be unusually successful in their behalf. He did not originate the practice of solicitation, but found it prevailing in Milwaukee when he commenced practice there.

I do not believe justice demands that Cannon be disbarred. He has already suffered much. His character has been falsely assailed, as the referee has found. Some of the charges were grossly libelous, but by being given judicial dignity they were accorded the freedom of the press, and were published broadcast. For whatever ethical mistakes he has made he has paid a high penalty. Not only has he paid the penalty for his own mistakes, but, like Kiefer, he has been made a vicarious sacrifice. Cannon is charged with no crime and has been found guilty of no crime.

It is not Cannon alone that is to be considered. The interests of the bar as a whole are at stake. If attorneys may be subjected to such inquisitions and ruthless charges in the future, we may expect a weak and spineless bar,—one that will be afraid to fight the battles of the poor and humble as they ought to be fought to secure justice. If an attorney's whole life may be searched for some flaw to ruin him at the instigation of an enemy, the practice of law is a dangerous occupation, for attorneys make enemies in the honest service of their clients.

However, conceding that Cannon should be disciplined, I feel that the punishment inflicted is excessive. The costs, excluding his attorneys' fees, will exceed $3,100. His loss in practice has been great, and it will be a long time before he can overcome the effects of the inquisition and this prosecution. In no view of the case should the penalty be in excess of that inflicted in the *Kiefer Case*.

ROSENBERRY, C. J., and FRITZ, J., took no part.