STATE, Plaintiff, vs. RUBIN, Defendant.

*January 11—February 4, 1930.*

*Spencer Haven* of Hudson, attorney for plaintiff and counsel for the State Board of Bar Commissioners.

*I. A. Fish* of Milwaukee, for the defendant.

STEVENS, J. The power of this court to discipline a member of its bar by suspending or canceling his license to practice law, when essential to protect courts and the public, is established by former decisions of this court. *State v. Cannon,* 196 Wis. 534, 221 N. W. 603; *Id.* 199 Wis. 401, 226 N. W. 385. The only question presented by the record is the matter of the judgment that should be entered.

The charges against Mr. Rubin fall under three general heads:

*First.* His conduct in connection with the filing of an affidavit for an adverse examination in an action for conspiracy to defame.

*Second.* Statements made by Mr. Rubin in a document filed with Judge AARONS.

*Third.* Charges that Mr. Rubin solicited cases.

(1) Considering first the charges of ambulance chasing, the situation presented is very different from that considered in *State v. Kiefer,* 197 Wis. 524, 222 N. W. 795, and *State v. Cannon,* 199 Wis. 401, 226 N. W. 385. In these cases solicitors working out of the offices of the attorneys for whom they solicited were devoting their entire time to securing cases for the members of the bar whose license to practice was suspended in those cases. The proof shows that Mr. Rubin never authorized any one to solicit cases for him and that he never paid any ambulance chaser for services rendered in securing cases which came to his office.

With an exception to be noted later, the most that was found by the referee was that Mr. Rubin and his associates accepted retainers in cases brought to their offices by men whom they knew to be engaged in ambulance chasing. But the proof shows that neither Mr. Rubin nor any of his associates ever paid these solicitors any compensation for bringing cases to their office. It is significant that in a business which involved approximately twenty-six thousand cases during the time Mr. Rubin has been in practice the referee

found only thirteen cases in which there was any solicitation. It is true that the investigation was largely confined to the years in which the volume of Mr. Rubin's personal injury business had decreased very greatly. But it will be noted that one of the cases reported by the referee arose in 1921. In one of the thirteen cases taken to Mr. Rubin's office by solicitors, the person solicited was a former client of Mr. Rubin's partner.

There are only three cases in which there is any proof that Mr. Rubin ever personally solicited cases. One of these cases was not among those charged in the complaint. Another arose in 1921. In each of these cases Mr. Rubin testified to facts which might lead an attorney to believe that it had been determined that he was to be retained in the case. His testimony as to these facts is corroborated by some witnesses and contradicted by others. On this conflicting proof the referee found that these three cases were solicited by Mr. Rubin and others.

Upon this branch of the case the court is satisfied that the personal solicitation by Mr. Rubin of three cases during the period from September, 1921, to June, 1926, and the accepting of retainers in ten other cases from October, 1925, to June, 1926, which were brought to the office by men known to be ambulance chasers, does not establish the fact that Mr. Rubin is a man unfit to longer act as a minister of justice in the courts of this state.

It is unethical for a member of the bar to solicit business. No member who cherishes the high ideals of the profession will be guilty of such unethical practice. But the court cannot say that three violations of this canon of ethics in a period of five years demonstrates that the offender is unfit to continue the practice of his profession. The evils attendant upon solicitation are not apt to arise out of an occasional infraction of this canon of ethics by the lawyer. These evils are more apt to appear when there is organized solicita-

tion by men who are not members of the profession who may be tempted by their commercial zeal to stir up litigation and to attempt to create causes of action where none · in reality exist.

Mr. Rubin has consistently opposed ambulance chasing. He drafted a bill prohibiting it which was presented to the Wisconsin legislature in 1915. He presented a resolution to the bar association to accomplish the same purpose. He co-operated with the officers of the American Federation of Labor and with the representatives of the Italian and Austrian-Hungarian governments in working out plans that would protect injured workmen from the ambulance chaser and the claim adjuster. He had reason to oppose all organized solicitation of cases, because it was through this system of solicitation that he had lost much of the large volume of personal injury business that had formerly come to his office.

There is an entire want of proof of any such exorbitant charges for legal fees as appeared in other disbarment cases that have been presented to this court. The referee found that Mr. Rubin has given "his services in many cases as a matter of charity. . . . There is no proof in this case of dishonesty on his part in his relations with his clients."

(2) The basis for the second group of charges against Mr. Rubin is found in the statement submitted by him to Judge AARONS in which he listed the information possessed by him upon which he based allegations contained in his affidavit for adverse examination, to which reference will later be made. The referee found that many of these statements were made without investigation as to their truth and without sufficient knowledge to form a belief as to their truth or falsity and that these statements unjustly reflected upon others.

To properly judge of the effect to be given these findings of the referee we must consider the circumstances under

which this statement was made. The branch of the circuit court presided over by Judge AARONS had been engaged for some time in investigating ambulance chasing in Milwaukee. In the course of the investigation proof had been offered that tended to connect Mr. Rubin with the organized solicitation of cases. Mr. Rubin began an action against the three members of the bar who were conducting such investigation alleging in an affidavit for an adverse examination that these men had conspired to injure and defame him by maliciously and deliberately withholding the truth from the court. Upon these allegations being brought to the attention of the court that was conducting this investigation, the court summoned Mr. Rubin and directed that he be sworn and disclose the facts that led him to make these charges. Because of his refusal to be sworn he was adjudged guilty of contempt.

This court in *Rubin v. State*, 194 Wis. 207, 216 N. W. 513, affirmed that contempt judgment and remanded the cause with directions to permit Mr. Rubin to purge himself of the contempt by taking the stand and testifying as directed by the circuit court. In response to this mandate Mr. Rubin took the stand, was sworn, and was directed by the court to disclose the information upon which he relied in making the affidavit for an adverse examination. At the direction of and pursuant to leave given by Judge AARONS, Mr. Rubin filed the document in question which recited the information on which he based his charges, which he requested should be considered by the court as a continuation of his sworn testimony.

This recital of the facts demonstrates that the filing of this document cannot be made the basis of any proceeding to discipline Mr. Rubin. He resisted the right of the court to require him to disclose the information contained in this document until he was forced to do so by the mandate of this court in order to purge himself of contempt and to escape confinement in jail.

The only thing that reflects upon Mr. Rubin is that this statement discloses that he had accepted information as sufficient basis for his charge of conspiracy without making investigation to determine whether the information upon which he relied and acted was in fact true. But this is not ground for disbarment. If all lawyers were disbarred who have started actions relying upon information that was subsequently found to be unreliable, the number of the members of the bar would be greatly reduced.

(3) The charges against Mr. Rubin contained in the third group are all based upon an affidavit filed by him for the purpose of securing an adverse examination to enable him to draft a complaint in his action for conspiracy to defame. The nature of the investigation of ambulance chasing, referred to above, which was then in progress, is quite fully set forth in *State ex rel. Reynolds v. Circuit Court,* 193 Wis. 132, 214 N. W. 396, and *Rubin v. State,* 194 Wis. 207, 216 N. W. 513. When proof was offered in that investigation which tended to show that Mr. Rubin had been guilty of unprofessional conduct, he did not attempt to explain or controvert this proof. He began an action against the three members of the bar who were conducting the investigation.

In an affidavit which he alleges was made for the purpose of enabling him to plead, Mr. Rubin alleged "that the above named defendants for personal gain and political advantages for some of them, and for other reasons, on the pretext of exposing so-called 'ambulance chasing' of personal injury cases in Milwaukee, have entered into a conspiracy, actuated by jealousy, envy, and hatred, to injure the good name and reputation of said affiant, to hold him up to public ridicule and contempt, and to make it appear that he was and has been an 'ambulance chaser' and that he did deal dishonestly by his clients; entered into a conspiracy . . . to withhold the whole truth and tell only portions, or to tell matters

whereby it would be made to appear that said plaintiff was an undesirable practitioner. . . . That said defendants have in said so-called investigations wilfully and deliberately withheld information which they had concerning matters which they have sought to bring to public attention, and which have been published and spread in the public newspapers, that would have proven the untruth and falseness of each and every one of their accusations, and that all of the foregoing has been done wilfully and unlawfully."

This affidavit made by Mr. Rubin also contained most fulsome praise of himself. He alleges that "he has been openly known for his good private and public moral and legal character and honesty; . . . that his dealings with his said clients have been above reproach, open, loyal, and honest, and that he has always made true, open, and honest accountings. That he has given a large portion of his time and efforts to defending the worthy poor, without any charge or remuneration whatever therefor. That he has taken an independent stand on numerous public questions, and has always conducted his law business without fear or favor, and that by reason thereof, and because of his stand against public-service corporations and for the people, he has had the confidence of the masses of the people in the city of Milwaukee and elsewhere and has been much hated by the interests."

Mr. Rubin testified that one of his motives for making and filing this affidavit was the hope that it would be published.

It is apparent from a reading of the affidavit that the portions quoted above were not drafted for the purpose of securing information which would enable Mr. Rubin to draft his complaint. On the contrary these paragraphs indicate that he then considered that he was in possession of facts which were sufficient to authorize him to charge the defendants with a conspiracy to defame him. Apparently

Mr. Rubin later recognized that the paragraphs quoted above had no place in an affidavit for an adverse examination. In the statement filed with Judge AARONS, to which reference has already been made, Mr. Rubin states that this "affidavit could and should have omitted some of the recitals," and that "no doubt if further deliberation had been given, the affidavit would have been much shorter and would have omitted matter that has been since denominated as offensive."

In determining whether Mr. Rubin's conduct in bringing this action and making use of the right to examine adversely is such as to require condemnation, the court must view his course of action from the standpoint of the facts as they appeared at that time. Mr. Rubin had been unjustly charged with professional misconduct by testimony that had been given wide publicity, which was taken in a proceeding for which there were then few, if any, judicial precedents. The situation was one which would naturally tend to irritate any one placed in Mr. Rubin's position. The nature of the powers possessed by the tribunal conducting the investigation was open to question, until later determined in *State ex rel. Reynolds v. Circuit Court,* 193 Wis. 132, 214 N. W. 396. This court recognized that "one situated as was Mr. Rubin might well raise the question of jurisdiction and desire to have that question finally determined by a court of last resort." *Rubin v. State,* 194 Wis. 207, 216 N. W. 513.

Acting under these circumstances Mr. Rubin cannot be censured because he questioned the power of the court to proceed with the investigation. The only question that is open is whether he is subject to censure because of the means adopted by him to present that question. Had he responded to the request that he appear at the investigation and meet the proof offered that tended to show that he had been guilty of unprofessional conduct, as he met and explained it upon this trial,—instead of sending the curt

response that those conducting the investigation could go to Hell,—he would have played the part of a high-minded member of our profession. He would also have relieved this court of an unpleasant duty. But he was under no obligation to attend the hearing or to give testimony, at that stage of the proceeding. Had he been content simply to refuse to participate in the proceedings, he would not have been charged with unprofessional conduct. But he did not remain passive. He began active opposition to the investigation by commencing an action for conspiracy with the evident purpose of discrediting not only the attorneys conducting the proceeding, but the proceedings themselves and the court in which the proceedings were being conducted.

The referee found, in accord with the great weight of the evidence, that this action begun by Mr. Rubin "tended to interrupt, and did in fact interrupt, the proceedings that were then being conducted by the court. It tended also to impair the usefulness of the lawyers who were assisting the court in the examination of witnesses and who were made defendants in the action commenced by Mr. Rubin." The referee also found that Mr. Rubin's action "had a tendency to intimidate the attorneys who were assisting the court and impair their usefulness in the proceeding, . . . and to a considerable extent discredit the investigation in the eyes of the public."

Mature and careful consideration of the entire record leads this court to the conclusion that the commencement of this action not only had the tendency found by the referee, but that it was the deliberate purpose of Mr. Rubin to use the process of the law to interrupt and delay the investigation, discredit it in the eyes of the public, and intimidate the lawyers who were conducting the investigation, as well as the judges who participated in the proceeding, because Mr. Rubin planned to make these three judges parties defendant to his action for unlawful conspiracy.

Such conduct on the part of a member of the bar is not only unprofessional, it is highly reprehensible. The investigation was being conducted by a duly elected and qualified judge, exercising powers that are vested in courts. Mr. Rubin had the right to question the jurisdiction of the court by any proper legal procedure, but he had no right to attempt to accomplish his purpose by organizing and carrying forward a campaign to discredit the court and these judicial officers. We can conceive of nothing fraught with more danger to established institutions than the doctrine that one who desires to question the power of any governmental agency may cast aside all orderly procedure and seek to control such agency by interrupting its proceedings, discrediting it, and intimidating its officers. Such a course of conduct is especially reprehensible on the part of a member of the bar who has taken an oath to support the constitution and the governmental agencies created by it.

The court cannot pass without censure Mr. Rubin's deliberate use of legal process for the apparent purpose of giving controlling force to his will that the investigation be discredited and its usefulness impaired, without waiting for any judicial determination as to the jurisdiction of the court which conducted the investigation. Mr. Rubin is a lawyer of marked ability and long experience at the bar who must be held to have known the effect of the course of action he was pursuing and to have deliberately planned to impose his will by intimidating those who were conducting this investigation. The court cannot overlook the fact that this is not the first time that Mr. Rubin had displayed the same determination to make his will prevail when in conflict with constituted authority. *Rubin v. State,* 192 Wis. 1, 211 N. W. 926.

But in view of the fact that Mr. Rubin was justified in questioning the legality of the ambulance-chasing investigation and that the only ground of censure is found in the

means adopted by Mr. Rubin to raise that question, and that he acted hastily under circumstances that were not conducive to considerate and deliberate action, the court concludes that the case is not one calling for any suspension of the right to practice law.

*By the Court.*—It is hereby adjudged, upon the report of the referee, that the defendant, W. B. Rubin, was guilty of unprofessional conduct in his use of the right to examine adversely, as more fully set forth in this opinion.

It is further ordered and adjudged that the defendant be punished by the imposition and payment of a fine in the sum of five hundred ($500) dollars, together with the fees of the clerk of this court, said fine and fees to be paid within thirty (30) days from the date when the said fees are taxed.

FRITZ, J., took no part.