## IN RE CANNON: APPLICATION FOR REINSTATEMENT AS A MEMBER OF THE BAR.

*November 14, 1931—January 12, 1932.*

*William A. Hayes* of Milwaukee and *Henry Lockney* of Waukesha, for the applicant.

*Spencer Haven* of Hudson, special counsel, for the Board of State Bar Commissioners.

For the State there were briefs by the *Attorney General* and *J. E. Messerschmidt,* assistant attorney general, a supplemental brief signed by *Fred M. Wylie,* deputy attorney general, and oral argument by *Mr. Messerschmidt.*

Owen, J.   Raymond J. Cannon, a former member of the
bar of this court, was ordered suspended from such office
for a period of two years on the 5th day of July, 1929.
*State v. Cannon,* 199 Wis. 401, 226 N. W. 385.   The order
of suspension, as an additional penalty, required the said
Raymond J. Cannon to pay the costs of the original proceed-
ing against him, which were taxed at the sum of $2,699.78.
The costs thus taxed were not paid.   On the 28th day of
May, 1931, under the provisions of said order, he made ap-
plication for his reinstatement.   In accordance with the
usual practice of this court, his application was referred to
the Board of State Bar Commissioners, with instructions to
make special inquiry and report with reference to the follow-
ing matters : (1) the ability of the said Raymond J. Cannon,
at the time of the entry of the order of disbarment, to pay
and discharge the judgment for costs; (2) the present ability
of the said Raymond J. Cannon to pay and discharge said
judgment for costs; (3) as to whether the conduct of the
said Raymond J. Cannon since the date of his disbarment
gives assurance that if he be re-admitted he will observe the
obligations of the legislative oath required of attorneys, with
especial reference to that clause which requires an attorney
to maintain the respect due to courts of justice and judicial
officers; and (4) as to whether said Raymond J. Cannon
made public charges against courts or judicial officers of this
state embracing criminal misconduct, malfeasance in office,
or immorality, and, if such charges were made, what basis
in fact there was therefor.   In obedience to said reference
the Board of State Bar Commissioners made and filed its
report with this court on the 19th day of September, 1931,
to which reference will hereafter be made.

The application was argued before the court on the 14th
day of November, 1931.   Aside from the question of

whether the conduct of Mr. Cannon subsequent to his suspension had been such as to merit reinstatement, the court was confronted with the serious question of whether ch. 480, Laws of 1931, was constitutional in so far as it purports (1) to reinstate said Raymond J. Cannon as an attorney at law; and (2) in so far as it purports to remit the costs imposed upon Mr. Cannon by the order of suspension. The statute reads as follows:

"The license to practice law, duly issued to Raymond J. Cannon on the thirtieth day of April, 1914, and revoked by judgment of the supreme court on July 5, 1929, is hereby restored, and the costs imposed by said judgment are hereby remitted, and the said Raymond J. Cannon is hereby authorized, henceforth, to exercise all the rights and privileges of a duly licensed member of the bar."

Upon the question of the validity of this statute briefs *amici curiæ* were invited by the court, and we greatly appreciate the able and willing response to such invitation.

At the outset, we must consider the orderly manner of treatment of the various questions presented. If we should conclude to grant the petition for reinstatement upon the merits, we may avoid consideration of the question of the power of the legislature to enact the statute referred to. On the other hand, if the act of the legislature is efficient to reinstate Mr. Cannon as a member of the bar, the court need not consider the merits of the application.

It has been suggested that the court should not consider the constitutionality of the statute unless it finds it absolutely necessary to do so; this in obedience to the general reluctance of courts to declare statutes unconstitutional and to face such questions only under imperative circumstances. It is further said that to declare the statute unconstitutional will but lend emphasis to a clash between two co-ordinate departments of the government and promote discord and ill will where the best interests of society require the existence of amity and consideration.

We do not impute to this act a legislative challenge of the authority of this court, nor do we see in it a hostile or belligerent attitude on the part of the legislature towards the court. The legislature has too recently given evidence of its confidence in the court (ch. 404, Laws of 1929; ch. 366, Laws of 1931) for us to construe this act as indicative of legislative defiance. We rather consider the act as an assertion of what the legislature itself probably considered a doubtful power.

The deputy attorney general suggests that the question is worthy of an original and fundamental investigation, freely conceding that an amplitude of authority may be found for the assertion of the inherent power of the court. We are impressed with the thought that it would be a very weak response to the responsibility imposed upon this court if it sought a way to avoid the determination of this question, involving as it does the respective powers of co-ordinate branches of the government. We do not fail to appreciate the delicacy in considering a disputed question involving legislative and judicial power. We easily subject ourselves to the criticism of usurping power where by our decision the power is committed to the judicial rather than the legislative department of government. However, we may as easily subject ourselves to the criticism of timidity were we to betray a disposition to avoid responsibility. The usurpation of power is not more culpable than the abdication of responsibility.

This statute presents an assertion of legislative power without parallel in the history of the English-speaking people so far as we have been able to ascertain. There has been much uncertainty as to the extent of the power of the legislature to prescribe the ultimate qualifications of attorneys at law, but in England and in every state of the Union the act of admitting an attorney at law has been expressly committed to the courts, and the act of admission has always been

regarded as a judicial function. This act purports to constitute Mr. Cannon an attorney at law, and in this respect it stands alone as an assertion of legislative power. Two acts of the legislature of the state of New York, one relating to the admission of Woodrow Wilson as an attorney at law and the other to the admission of John B. Sargent, are cited as precedents, neither of which, however, constitutes any precedent for the act under consideration, as will be hereafter pointed out.

In view of the uncertainty revealed by the pronouncements of courts throughout the country concerning the exact extent of the power of the legislature to prescribe the ultimate qualifications of attorneys at law and to supervise the disciplinary power of the courts over them, we are persuaded that we may render a helpful service at this time by following the suggestions of the deputy attorney general in making an original and fundamental investigation of the question, disregarding for present purposes the rather uncertain and conflicting views of American courts. We enter upon this undertaking satisfied in our own consciences that it will not be influenced by a lust for power, but that we shall willingly follow wherever the light may lead, imbued only with the purpose to declare the seat of this power to reside where the framers of the constitution intended. No greater responsibility rests upon this court than that of preserving in form and substance the exact form of government set up by the people. That is the responsibility which the people themselves devolved upon this court, and if we are true to our oaths and worthy of our stations we will not hesitate to declare the power a judicial one if such shall appear to have been the intention of the framers of the constitution. We cannot see that the charge of judicial lust for power is more reprehensible than the charge of legislative lust for power, and it is not becoming for any department of government to yield its power as a matter of deference. That amounts to

a method of amending the constitution in which the people are accorded no voice.

Under our constitution all legislative power is vested in a Senate and Assembly. Sec. 1, art. IV. In so far as the prescribing of qualifications for admission to the bar are legislative in character, the legislature is acting within its constitutional authority when it sets up and prescribes such qualifications. That there is a field within which the prescribing of such qualifications constitutes a legislative function, cannot be doubted. One of the very important functions of the legislature is to promote the public welfare and to protect the public from the results of incompetence, imposition, and fraud on the part of those who assume to practice the learned professions and occupations requiring skill and special training. In obedience to its duty in this respect, the legislature of this state has limited those who may follow such professions and occupations to such as may demonstrate in the manner prescribed by the legislature their fitness and qualifications for such callings. Realizing that those who assume to practice law without the proper learning and good moral character have it in their power to work great harm upon those who have a right to assume that they are properly qualified to advise them in legal matters and to protect them in their legal rights, the legislature has very properly prescribed certain qualifications which must be possessed by those who become licensed as attorneys at law. The qualifications thus prescribed by the legislature are presumptively such qualifications as the legislature has deemed necessary in order to promote the public welfare and to protect the citizens of the state from imposition on the part of those who are licensed to act as attorneys at law. In thus legislating the legislature has acted within a plain legislative field and has exercised its police power to promote the welfare of the citizens of the state. There can be no challenge to the right of the legislature to exact of those who desire

or assume to practice law such qualifications as in the judg-
ment of the legislature are necessary to protect the citizens
of the state from becoming the unconscious victims of dis-
honesty or incompetence.

But when the legislature has prescribed those qualifica-
tions which in its judgment will serve the purpose of legiti-
mate legislative solicitude, is the power of the court to
impose other and further exactions and qualifications fore-
closed or exhausted? In so far as the prescribing of such
qualifications constitutes legislative power, that power can be
exercised only by the legislature. There can be no doubt
about that. It is apparent, however, that the judiciary may
have another and different interest in the talents, qualifica-
tions, and character of those who are to become officers of
the courts, as attorneys at law in this country are universally
conceded to be.

Under our constitution the judicial and legislative depart-
ments are distinct, independent, and co-ordinate branches of
the government. Neither branch enjoys all the powers of
sovereignty, but each is supreme in that branch of sover-
eignty which properly belongs to its department. Neither de-
partment should so act as to embarrass the other in the dis-
charge of its respective functions. That was the scheme and
thought of the people in setting up the form of government
under which we exist. *State ex rel. Crawford v. Hastings,*
10 Wis. *525, p. 468; *Attorney General ex rel. Bashford v.
Barstow,* 4 Wis. 567. "The office of attorney and counselor
of the courts is one of great official trust and responsibility
in the administration of justice; one liable to great abuse;
and has always been exercised, in all courts proceeding ac-
cording to the course of the common law, subject to strict
oversight and summary power of the court." *In re Mos-
ness,* 39 Wis. 509. "The necessity of a distinct profession,
to render the application of the law easy and certain to every
individual case, has always been felt in every country under

the government of written law." 1 Kent's Commentaries, 307. "The rise and perpetuation of a legal system is dependent on the development and survival of a highly trained professional class." 3 Wigmore's Panorama of World's Legal Systems, 1129. Wilson emphasizes the necessity for a separate profession because of the fact that the "common law is the law of experience." 2 Wilson's Works, 251. Wilson also lists attorneys and counselors as one of the constituent parts of courts. 2 Wilson's Works, pp. 157 and 244 *et seq.*

The judicial department of government is responsible for the plane upon which the administration of justice is maintained. Its responsibility in this respect is exclusive. By committing a portion of the powers of sovereignty to the judicial department of our state government, under a scheme which it was supposed rendered it immune from embarrassment or interference by any other department of government, the courts cannot escape responsibility for the manner in which the powers of sovereignty thus committed to the judicial department are exercised.

The relation of the bar to the courts is a peculiar and intimate relationship. The bar is an attaché of the courts. The quality of justice dispensed by the courts depends in no small degree upon the integrity of its bar. An unfaithful bar may easily bring scandal and reproach to the administration of justice and bring the courts themselves into disrepute. During recent years courts have been criticised because of unfortunate delay in the termination of litigation. Whatever delay there is in this state in the dispatch of litigation is due to causes over which the courts themselves have little control and, in many instances, is due to the procrastination of counsel. It is not at all uncommon for this court to dispose finally of litigation within a year after it has been instituted, and yet there are many cases which consume an unjustifiably longer time. For such cases the court suffers

the rebuke of public opinion, and, when such delay is due to the inattention of counsel, it is apparent that the courts themselves have an interest in the quality of their bar quite distinct from and additional to the reasons which motivate legislative regulation.

Throughout all time courts have exercised a direct and severe supervision over their bars, at least in the English-speaking countries. In the Middle Ages there was no necessity for a bar. Either the King or his representative acted as the Judge. The subjects appeared in court, stated their grievances, and the King or his representative rendered the judgment. Later, it appears that a litigant was permitted to appear in court by an attorney, with the King's special warrant by writ or letters patents. "For by the common law, the plaintife or defendant, demandant or tenant, could not appear by attornie without the King's special warrant by writ or letters patents, but ought to follow his suite in his owne proper person (by reason whereof there were but few suits)." Coke Upon Littleton, Butler & Hargrave's Notes (19th ed.) 128a. "The power to appoint an attorney was a privilege to be conceded by royal grant; the appointment must be strictly proved; and in the royal courts an attorney must be appointed by the litigants in court. Glanvil, it is true, does not mention an attorney *eo nomine;* but he has much to say of the responsalis. He was a person who, it would seem, if formally appointed in court, answered to the attorney of later days; and, if informally appointed out of court, answered to the bailiff or responsalis of Bracton's day. The control of the court was naturally closer over the responsalis formally appointed in court; and this control took shape in rules as to his powers and position which came definitely to differentiate him from the mere bailiff." 2 Holdsworth's History of English Law, pp. 315, 316.

Pursuant to this practice, apparently an unorganized, uneducated, and miscellaneous class presumed to act as attor-

neys for litigants in court, and the evil resulting therefrom prompted Parliament to enact c. 18, 4 Henry IV, in the following language:

"Item, for sundry damages and mischiefs that have ensued before this time to divers persons of the realm by a great number of attornies, ignorant and not learned in the law, as they were wont to be before this time; (2) it is ordained and stablished, That all the attornies shall be examined by the justices, and by their discretions their names put in the roll, and they that be good and virtuous, and of good fame, shall be received and sworn well and truly to serve in their offices, and especially that they make no suit in a foreign county; and the other attornies shall be put out by the discretion of the said justices; (3) and that their masters, for whom they were attornies, be warned to take others in their places so that in the meantime no damage nor prejudice come to their said masters. (4) And if any of the said attornies do die, or do cease, the justices for the time being by their discretion shall make another in his place, which is a virtuous man and learned, and sworn in the same manner as aforesaid; (5) and if any such attorney be hereafter notoriously found in any default of record, or otherwise, he shall forswear the court, and never after be received to make any suit in any court of the King. (6) And that this ordinance be holden in the exchequer after the discretion of the treasurer and of the barons there."

Of this it will be noted, first, that it was an act of Parliament, which body by the constitution of England possessed all the powers of sovereignty and furnishes no analogy for the powers possessed by the legislatures of this country. The power possessed by Parliament is more analogous to the fully executed power of a constitutional convention ratified by the people. It possessed all the powers of sovereignty over any and all the courts of England. It could regulate their procedure, or even abolish the courts themselves. So that the mere fact that Parliament enacted a law such as this, does not argue the existence of a similar power in our state legislature. But note, second, the tenor of this statute. It was manifestly passed to correct a recognized public evil

growing out of the damage and mischief that had resulted from the ignorance of those who assumed to act as attorneys. To this extent and for this purpose it is freely conceded that the state legislature has power to prescribe the qualifications of attorneys. Note, also, the very general qualifications that are prescribed by the act of Parliament. It simply prescribes that they shall be good and virtuous and of good fame, and then requires that they be examined by the justices, and that their names shall be put in the roll in the discretion of the justices, and that the other attorneys shall be put out by the discretion of the justices. This act presumes to exercise a very mild censorship over the discretion of the judges in the exercise of their supervisory control over the bar. In fact, it is an explicit recognition of the fact that such a supervisory control should and does belong to the courts. Then, again, it refers only to attorneys. It does not refer to Serjeants, who at the time were the only persons who could appear before the court. Our attention is called to no other statute having particular importance bearing upon this subject.

From that time down to the present, Barristers, who are now perhaps the only class of the legal profession who are permitted to appear and argue before the courts of England, were called to the bar by the Inns of Court. These are seminaries of legal learning of great antiquity. They are unincorporated voluntary associations. These seminaries afford the only avenue through which one ambitious of attaining the rank of Barrister may gratify that ambition. He must secure entrance into and reside within the Inns of Court until he is called to the bar by the governing body of the particular Inn, which is called the Benchers. We cannot find that Parliament has ever exercised any control over the Inns of Court. However, it does appear that the Inns of Court are subject to the visitation of the Twelve Judges and that the Judges always have exercised an advisory supervi-

sion over the Inns. It is not easy to determine just the extent of this supervisory control or the manner in which it is exercised. But it does clearly appear that the Judges exercise a reviewing power over the authorities of the respective Inns.

Thus, in *The King against the Benchers of Gray's Inn,* on the Prosecution of William Hart, Lord MANSFIELD said:

"The original institution of the Inns of Court nowhere precisely appears, but it is certain that they are not corporations, and have no constitution by charters from the Crown. They are voluntary societies, which, for ages, have submitted to government analogous to that of other seminaries of learning. But all the power they have concerning the admission to the bar, is delegated to them from the Judges, and, in every instance, their conduct is subject to their control as visitors. This will appear from a great variety of instances of orders made at different periods, for the regulation of those societies, which are to be found in Dugdale's Origines Jurisdiciales, some of which I will mention."

The court denied a writ of *mandamus* which had been applied for, compelling the Inn to call the applicant to the degree of a barrister at law. It concluded: "but, if there is a ground for it, the party must take the ancient course of appealing to the Twelve Judges." In a note to the case it appears that Hart afterwards appealed to the Twelve Judges, and he was heard by his counsel. It appeared that the Benchers of Gray's Inn had refused to call him to the bar merely because he had been discharged by an insolvent act and that he had knowingly become security for money borrowed by others, to a much greater amount than he was able to answer. The Judges were unanimous in dismissing the petition. 1 Douglas Reports, 353. From this it appears conclusively that the power which the Inns of Court have in the matter of calling to the bar is delegated to them by the courts, which means that the fundamental and original power is lodged with the courts themselves.

In Law Pamphlets, vol. 71, to be found in our law library, appears a report of the proceedings of the investigation before the Benchers of the Inner Temple upon the application of D. W. Harvey, Esq., M. P., to be called to the bar. It appears from this report that the application of Mr. Harvey to be called to the bar was denied by the Benchers; that their action was approved by the Judges on appeal, and that thereafter Mr. Harvey secured a rehearing before the Benchers. The Pamphlet contains the full report of the evidence taken upon that rehearing, which resulted in the Benchers again denying the application. As bearing upon the question we are now considering, the significant statement is found on page IX of the Pamphlet, which reads:

"Early in December, 1821, Mr. Harvey appealed against this rejection to the Twelve Judges who act as visitors over the Inns of Court, praying that their Lordships would call upon the Masters of the Bench to certify to their Lordships their objections to his demand to be called to the Bar, and that their Lordships would appoint a day for hearing him, either in person or by counsel, in appeal against such objections. In compliance with this petition, the Masters of the Bench were required to certify their objections, and they accordingly did so in a Certificate under the signature of the Treasurer, dated 30th January, 1822."

Then follows a summary of the hearing before the Judges, with the statement that "the Judges signify their approval of the decision of the said Benchers." This report can leave little doubt of the subordination of the Inns to the Courts, and that in exercising the function of calling to the bar they are acting simply as advisors of the court. In the same volume is to be found a pamphlet entitled "The case between Lincoln's Inn, the Court of King's Bench, and Mr. T. J. Wooler," published by Henry Butterworth, London, in 1826, in which Mr. Wooler, who had been refused admission to Lincoln's Inn, caustically calls public attention to the

monopolistic control of legal learning by the Inns of Court, without apparent effect.

Another case in illumination of the supervisory power which the courts of England exercised over their bars is *Ex parte Brounsall,* 2 Cowper's Reports, p. 829, which was an application to the court to strike the defendant off the roll of attorneys, he having been convicted of stealing a guinea; for which offense he received a sentence to be branded in the hand, and to be confined to the house of correction nine months. The defense was that the offense was committed at least four or five years ago, since which time no mistake whatever could be imputed to the defendant, and that the defendant having received the benefit of clergy and having been branded in the hand, it operated as a statute pardon; therefore, to comply with the application would be to punish the defendant a second time for the same offense. In announcing the judgment of the court Lord MANSFIELD said:

"We have consulted all the judges upon this case, and they are unanimously of opinion, that the defendant having been burnt in the hand, is no objection to his being struck off the roll. And it is on this principle: that he is an unfit person to practice as an attorney. It is not by way of punishment; but the court on such cases exercise their discretion, whether a man whom they have formerly admitted, is a proper person to be continued on the roll or not. Having been convicted of felony, we think the defendant is not a fit person to be an attorney. Therefore let the rule be made absolute."

Here we have the exercise by the court of the power to disbar its attorneys without any authority from Parliament so far as we have been able to ascertain.

In the *Matter of the Serjeants at Law,* reported in 6 Bingham's New Cases, at p. 235, it appears that on the 4th day of April, 1834, a warrant was issued under the sign manual of the King "ordering and directing that the right of prac-

ticing, pleading, and audience in the Common Pleas during term time, should, from the first day of Trinity term 1834, cease to be exercised exclusively by the serjeants at law; and that, upon and from that day, the barristers at law might have and exercise equal right and privilege of practicing, pleading, and audience in the said court with the serjeants at law." There was acquiescence on the part of the serjeants and the courts in the directions of this warrant until 1839, when the validity of the warrant was called in question by the serjeants, who called upon the court to declare its opinion upon that question. In discussing the question the court said:

"Now, we think the question before us turns upon the single point, whether the serjeants at law have, by the constitution of the Court, and consequently by law, held and enjoyed the sole and exclusive privilege, by virtue of their office or degree of serjeant, of practicing, pleading, and audience in the Court of Common Pleas; for if they are so entitled, we think they cannot be deprived of it by a warrant from the Crown under the sign manual, nor indeed by any power short of an act of the whole legislature."

After referring to the traditional prerogatives enjoyed by the serjeants, the court continues:

"Immemorial enjoyment is the most solid of all titles; and we think the warrant of the Crown can no more deprive the serjeant who holds an immemorial office of the benefits and privileges which belong to it, than it could alter the administration of the law within the court itself. The rights and privileges of the serjeant, and rights and privileges of the peer of the realm, stand upon the same foundation, immemorial usage."

This opinion plainly puts the power of the court to designate those who should appear before it beyond the power of any interference short of that of the whole legislature, which, as has already been stated, finds analogy in this country only in a constitutional provision. It may be stated

further, more as a matter of interest than as having any particular bearing upon our question, that on the 18th day of August, 1846, Parliament enacted c. 54, 9 & 10 Vict., extending to all barristers practicing in the Superior Courts of Common Law at Westminster the privileges of Serjeants at Law in the Court of Common Pleas. The act recites that "Whereas, it would tend to the more equal Distribution and to the consequent Dispatch of Business in the Superior Courts of Common Law at Westminster, and would at the same Time be greatly for the Benefit of the Public, if the right of Barristers at Law to practice, plead, and to be heard extended equally to all the said Courts; but by reason of the exclusive Privilege of Serjeants at Law to practice, plead, and have Audience in the Court of Common Pleas at Westminster during Term Time, such object cannot be effected without the Authority of Parliament." Here it appears again that Parliament was induced to its actions by considerations of public welfare, and that it justified its interference with the internal affairs of the Court or the relations existing between the Court and its Bar only for the purpose of promoting the dispatch of business in the realm. Furthermore, it is a tacit recognition of the fact that no power short of an act of Parliament was sufficient for the accomplishment of that purpose, which, as already stated, is no authority for saying that such power constitutes purely legislative power, or that such power resides in our legislature by reason of the fact that it is the repository of mere legislative power.

But from what has been said, the limit of control which the courts of England exercised over their attorneys has not yet been stated. The extent of that control finds further elucidation in the opinion of Chief Justice CARDOZO in *People ex rel. Karlin v. Culkin*, 248 N. Y. 465, at p. 474 (162 N. E. 487), where he points out that the courts of England exercised the power of conducting general inquisi-

tions into the general conduct of their attorneys, and that in Easter Term, 9 Eliz. 1567, the lord chief justice charged a jury to inquire into the "falsities, erasures, contempts and misprisions" practiced generally by the attorneys of that court. The inquisition there conducted seems to have been quite similar in nature to the one upheld as within the power of the court in *Rubin v. State,* 194 Wis. 207, 216 N. W. 513, and in *People ex rel. Karlin v. Culkin, supra.* This power of regulation and disbarment was exercised by the English courts in the absence of any power expressly conferred by an act of Parliament. It was plainly a power exercised by the courts as necessary and proper to enable the court to discharge its functions. While Parliament spoke at least twice (c. 18, 4 Henry IV; c. 54, 9 & 10 Vict.) with reference to the matter of admission to practice before the courts, it was in one instance to consummate a limitation upon that right, and in the other to extend the right, but in both instances the necessity therefor was deemed to exist by reason of public conditions, and when Parliament did speak it was comparable to the voice of the people of this country assembled in the constitutional conventions.

With this background, we find that the people in this state, in constitutional convention assembled, provided by sec. 2, art. VII, Const., that the "judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, circuit courts, courts of probate, and in justices of the peace." No effort is made to define the term "court." It simply speaks of courts. At that time courts were understood to mean certain governmental institutions possessing certain powers which distinguished them from mere referees or debating societies. They had power to enforce order in the court, power to compel the attendance of witnesses, power to compel witnesses to testify, and power to enforce their orders. The constitution does not speak of the powers of courts. It does speak of their jurisdiction, but not of

their powers. In the same manner the constitution speaks of trial by jury, but it does not attempt to define the term "jury." It is settled that the trial by jury contemplated by the constitution was the trial by jury known to the common law. *Malinowski v. Moss*, 196 Wis. 292, 220 N. W. 197. So when the term "court" is used in the constitution it is plain that the framers had in mind that governmental institution known to the common law possessing powers characterizing it as a court and distinguishing it from all other institutions. This power has been referred to by all legal scholars and writers as the inherent power of courts. That courts possess inherent power, as has frequently been asserted by this court, was pointed out in *State v. Cannon*, 196 Wis. 534, 221 N. W. 603. The dissenting opinion of Mr. Justice CROWNHART in that case has evidently provoked a debate upon whether the power of the court to disbar a lawyer is inherent or implied. The controversy seems to be a controversy over names and not powers. Both opinions in the *Cannon Case* concede the power of the court in the premises, and when the power is conceded the matter of its proper designation may afford an intriguing subject for mental sparring; but whether it be called implied or inherent results in no substantial difference to the citizen or to the rights and liberties of our people. No one entertains the thought, whether it be called inherent or implied, that it is a power which transcends the constitution. It is a power which may be taken away by the constitution, just as all courts may be abolished by the constitution. No mere creature of the people can rise above the people in importance, dignity, or power. The statement in the opinion that it was a power that existed independent of the constitution merely meant that it was a power which inhered in the courts established by the constitution and existed by reason of their creation, independent of any affirmative power expressly conferred by the constitution. It is difficult to see why the designation of this

power as inherent constitutes a greater threat upon the liberties of the people than to designate it as implied power. The power means the same to those who call it implied as it does to those who call it inherent, and whether it be called implied or inherent is quite immaterial, except to those having a refined instinct for exactitude of expression.

In the most excellent brief of the assistant attorney general it is conceded that courts have many implied powers, but he expresses the view that in the *Cannon Case, supra,* rather extreme views were expressed as to the inherent powers of courts, and he professes to see a retraction of these views in the language used in *State v. Cannon,* 199 Wis. 401, 226 N. W. 385, to the effect that these powers are known as "incidental, implied or inherent powers, all of which are used to describe those powers which must necessarily be used by the various departments of government in order that they may efficiently perform the functions imposed upon them by the people." The expression in the latter case was rather used to indicate the inconsequentiality of the use of either term, and left the individual free to designate the power by any term that seemed more pleasing. It was a concession of nomenclature and not of substance.

The assistant attorney general prefers to call the power implied power, and then argues that the power cannot be implied from our constitution, because all judicial power is not conferred on the courts by the constitution. He dwells upon the fact that it is the judicial power only "in matters of law and equity" that is conferred upon the courts, and quotes from *State ex rel. Ellis v. Thorne,* 112 Wis. 81, 87 N. W. 797, where it is said:

"The constitution by no means provides that all authority to act judicially is or shall be vested in some one of the courts therein indicated. . . . The term 'matters of law and equity' refers to the administration of the law in actions and proceedings in courts of law and equity,—the exercise

of such power in such matters as was exercised by such courts at the time of the adoption of the constitution."

With this we agree, and we admit that courts have no concern with the qualifications of lawyers except in so far as they are permitted to participate in the administration of the law in actions and proceedings in courts of law and equity. If the legislature desires to classify attorneys at law, we are free to say that courts would not be concerned with the qualifications of those permitted to perform legal services or to give legal advice which has nothing to do with the administration of the law in actions and proceedings in courts of law and equity. The legislature may establish such qualifications as it chooses for those who are permitted to act as conveyancers, examiners of title, organizers of corporations, or any other type of legal services which does not give them power to influence the course of justice as administered by the courts. It seems unnecessary for us to review the many cases which may be cited bearing upon the question of the right of the legislature to prescribe qualifications for those who shall be admitted to the practice of the law. They are exceedingly numerous, some of which have grappled with the question in a fundamental and helpful way while others have given it but superficial consideration. No doubt the leading case in this country holding that the legislature may prescribe the ultimate qualifications for admission to the bar is *In re Cooper*, 22 N. Y. 67. It must be conceded that that is a well-considered case, but it has not been generally followed in this country, and apparently is not regarded as settling the matter in New York, as we find an expression in *People ex rel. Karlin v. Culkin*, 248 N. Y. 465, 162 N. E. 487, that "the question does not now concern us whether the power may be withdrawn or modified by statute (*In re Cooper*, 22 N. Y. 67, 68)," a quite unnecessary statement if it were thought that the *Cooper Case*

settled the question. Neither does our present examination of the question impress us with the soundness of the conclusion reached in the *Cooper Case*.

We think the separation of sovereign power by which the constitution assigns the legislative power to the legislature and the judicial power to the courts, with the purpose of making each department supreme and independent in its respective field, accords to the legislature the power of exacting of those who shall be admitted to the practice of the law such qualifications as the legislature shall deem sufficient to protect the public from the evils and mischiefs resulting from incompetent and characterless attorneys, which qualifications so prescribed must be respected by the courts. The courts cannot and should not license any as attorneys at law who do not possess the qualifications deemed by the legislature necessary for the protection of the public interest. That is what was meant when it was said in *Vernon County Bar Asso. v. McKibbin*, 153 Wis. 350, 141 N. W. 283:

"There is no question but that the legislature has power to regulate admission to the bar by prescribing a standard therefor, and it is the duty, as it should be the pleasure, of the court to give full effect to all reasonable efforts. in that regard. Further, in case of the legislature having, as here, prescribed conditions of eligibility to admission to practice law, which are reasonable, want of such conditions should be regarded as insurmountable."

Our conclusions may be epitomized as follows: For more than six centuries prior to the adoption of our constitution the courts of England, concededly subordinate to Parliament since the Revolution of 1688, had exercised the right of determining who should be admitted to the practice of the law, which, as was said in *Matter of the Serjeants at Law*, 6 Bingham's New Cases, 235, "constitutes the most solid of all titles." If the courts and the judicial power be regarded as an entity, the power to determine who should be admitted to practice law is a constituent element of that entity. It

may be difficult to isolate that element and say with assurance that it is either a part of the inherent power of the court, or an essential element of the judicial power exercised by the court, but that it is a power belonging to the judicial entity cannot be denied. Our people borrowed from England this judicial entity and made of it not only a sovereign institution, but made of it a separate, independent, and coordinate branch of the government. They took this institution along with the power traditionally exercised to determine who should constitute its attorneys at law. There is no express provision in the constitution which indicates an intent that this traditional power of the judicial department should in any manner be subject to legislative control. Perhaps the dominant thought of the framers of our constitution was to make the three great departments of government separate and independent of one another. The idea that the legislature might embarrass the judicial department by prescribing inadequate qualifications for attorneys at law is inconsistent with the dominant purpose of making the judicial independent of the legislative department, and such a purpose should not be inferred in the absence of express constitutional provision. While the legislature may legislate with respect to the qualifications of attorneys, its power in that respect does not rest upon any power possessed by it to deal exclusively with the subject of the qualifications of attorneys, but is incidental merely to its general and unquestioned power to protect the public interest. When it does legislate fixing a standard of qualifications required of attorneys at law in order that public interests may be protected, such qualifications constitute only a minimum standard and limit the class from which the court must make its selection. Such legislative qualifications do not constitute the ultimate qualifications beyond which the court cannot go in fixing additional qualifications deemed necessary by the courts for the proper administration of judicial functions. There is no

legislative power to compel courts to admit to their bars persons deemed by them unfit to exercise the prerogatives of an attorney at law. The power of the court in this respect is limited only to the class which the legislature has determined is necessary to conserve the public welfare.

But the statute is invalid for another reason. If it be granted that the legislature has power to prescribe ultimately and definitely the qualifications upon which courts must admit and license those applying as attorneys at law, that power cannot be exercised in the manner here attempted. That power must be exercised through general laws which will apply to all alike and accord equal opportunity to all. Speaking of the right of the legislature to exact qualifications of those desiring to pursue chosen callings, Mr. Justice FIELD in the case of *Dent v. West Virginia*, 129 U. S. 114, 121, 9 Sup. Ct. 231, said:

"It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to their possessors, and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken."

It is fundamental under our system of government that all similarly situated and possessing equal qualifications shall enjoy equal opportunities. Even statutes regulating the practice of medicine requiring examinations to establish the possession on the part of the applicant of his proper qualifications before he may be licensed to practice, have been chal-

lenged, and courts have seriously considered whether the exemption from such examinations of those practicing in the state at the time of the enactment of the law rendered such law unconstitutional because of infringement upon this general principle. *State v. Call,* 121 N. C. 643, 28 S. E. 517. See, also, *State ex rel. Winkler v. Benzenberg,* 101 Wis. 172, 76 N. W. 345; *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468.

This law singles out Mr. Cannon and assumes to confer upon him the right to practice law and to constitute him an officer of this court as a mere matter of legislative grace or favor. It is not material that he had once established his right to practice law and that at one time he possessed the requisite learning and other qualifications to entitle him to that right. That fact can in no manner affect the power of the legislature to select from the great body of the public an individual upon whom it would confer its favors.

A statute of the state of Minnesota commanded the supreme court to admit to the practice of law, without examination, all who had "served in the military or naval forces of the United States during the World War and received an honorable discharge therefrom and who (were) disabled therein or thereby within the purview of the act of Congress approved June 7, 1924, known as 'World War Veteran's Act, 1924,' and whose disability is rated at least ten per cent. thereunder at the time of the passage of this act." This act was held unconstitutional on the ground that it clearly violated the equality clauses of the constitution of that state. *In re Application of Humphrey,* 178 Minn. 331, 227 N. W. 179.

Furthermore, it is an unlawful attempt to exercise the power of appointment. It is quite likely true that the legislature may exercise the power of appointment when it is in pursuance of a legislative function. However, the authori-

ties are well-nigh unanimous that the power to admit attorneys to the practice of law is a judicial function. In all of the states except New Jersey (*In re Raisch*, 83 N. J. Eq. 82, 90 Atl. 12), so far as our investigation reveals, attorneys receive their formal license to practice law by their admission as members of the bar of the court so admitting. 6 Corp. Jur. p. 572; *Ex parte Secombe*, 19 How. 9; *Ex parte Garland*, 4 Wall. 333; *Randall v. Brigham*, 7 Wall. 523; *Hanson v. Grattan*, 84 Kan. 843, 115 Pac. 646; *In re Day*, 181 Ill. 73, 54 N. E. 646; *Danforth v. Egan*, 23 S. Dak. 43, 119 N. W. 1021.

The power of admitting an attorney to practice having been perpetually exercised by the courts, it having been so generally held that the act of a court in admitting an attorney to practice is the judgment of the court, and an attempt such as this on the part of the legislature to confer such right upon any one being most exceedingly uncommon, it seems clear that the licensing of an attorney is and always has been a purely judicial function, no matter where the power to determine the qualifications may reside.

We are referred to the fact that the state of New York in 1931 passed an act admitting John G. Sargent to practice law. The act, which was vetoed by the governor, however, did not purport to confer upon Mr. Sargent the right to practice law. The act simply provided that "The appellate division of the supreme court in the first department is hereby authorized to admit John G. Sargent, formerly attorney general of the United States, to practice law in all the courts of this state, without examination and without compliance with any provision of statute or rule relative to the admission of persons to practice as attorneys and counselors at law in the courts of this state." This act fell far short of an attempt to confer the rights and privileges of an attorney at law upon Mr. Sargent. It did no more than to authorize the supreme court to admit him without proof of

his compliance with the provisions of statute or rule. This act plainly recognized the judicial function in conferring that right. So far as this act is concerned, it amounts to little more than a waiver of conditions precedent to admission to the bar required by the statutes. The same remarks apply to the provisions of ch. 458, Laws of the state of New York for the year 1921, which similarly authorized the court of New York to admit to the bar Woodrow Wilson, formerly President of the United States. Neither of these acts attempted to exercise the power of conferring upon selected individuals the privilege of practicing law. We have been referred to no other legislative attempts which can be compared with the act under consideration, and, even though such attempts were analogous to this, such precedents could be accorded no weight in an inquiry concerning the seat of power.

It appears that in New Jersey the attorneys are first licensed by the governor and then admitted by the courts. This seems to be due to a custom that was perpetuated from colonial times. Speaking of this custom in *In re Raisch,* 83 N. J. Eq. 82, 90 Atl. 13, 14, it is said:

"So far as I am aware, this anomaly is not found in any other state of the Union, although, perhaps, some modification of this statement may be necessary. Certain it is that in England and in our federal courts, and in the most of the courts of the states, the practice has been settled for years of having the courts appoint as well as remove these officers. It is beyond all dispute that attorneys at law and solicitors in chancery are not officers of the state; they are not removable by impeachment. They are officers of the courts and are removable by the courts."

The act is void for still another reason. Mr. Cannon was suspended from practice by this court in exact conformity to power conferred upon it by the statutes of this state. That act of suspension was a judicial act. Speaking of the power of the legislature to revise the acts and judgments of

the court, it is said in the Federalist (G. P. Putnam's Sons ed.) at p. 504:

"It is not true, in the second place, that the Parliament of Great Britain, or the legislatures of the particular states, can rectify the exceptionable decisions of their respective courts, in any other sense than might be done by a future legislature of the United States. The theory, neither of the British, nor the state constitutions, authorizes the revisal of a judicial sentence by a legislative act. . . . A legislature without exceeding its province, cannot reverse a determination once made in a particular case; though it may prescribe a new rule for future cases."

In 6 Ruling Case Law, p. 162, § 163, it is said:

"Since the legislature does not possess and may not assume the exercise of judicial powers, it cannot interfere in any way with pending judicial controversies. Therefore the legislature cannot annul or set aside the final judgment of a court of competent jurisdiction, or take particular cases out of a settled course of judicial proceedings."

In *Janesville v. Carpenter*, 77 Wis. 288, 46 N. W. 128, the court considered a statute which made it "presumptively injurious to persons and property to drive piles, build piers, cribs, or other structures in Rock river within the limits of the county of Rock, and the doing of any such act shall be enjoined at the suit of any resident taxpayer without proof that any injury has been or will be caused by reason of such act." Of this law the court said, at page 301:

"The legislature usurped the judicial power of the courts by the enactment of this statute. It adjudicates an act unlawful and presumptively injurious and dangerous, which is not and cannot be made to be so without a violation of the constitutional rights of the defendant, and imperatively commands the court to enjoin it without proof that any injury or danger has been or will be caused by it. It reverses very many decisions of this court on the very questions involved in it, and which have the effect of a judicial determination of the defendant's rights of property. It violates sec. 2 of

art. VII of the state constitution, which provides that the judicial power of the state, both as to matters of law and equity, shall be vested in the various courts. It takes away the jurisdiction of the courts to inquire into the facts and determine the necessity and propriety of granting or refusing an injunction in such a case, according to the established rules of a court of equity. *Ervine's Appeal,* 16 Pa. St. 256. It is said in that case: 'That is not legislation which adjudicates in a particular case, prescribes the rule contrary to the general law, and orders it to be enforced. Such power assimilates itself more closely to despotic rule than to any other attribute of government.' "

The effect of the act under consideration was to nullify and set aside a judgment of this court. That this was beyond the power of the legislature is too plain to justify further citation or elucidation. For these various reasons it must be held that the act which purported to reinstate Mr. Cannon as an attorney at law was utterly unconstitutional and void and entirely impotent to accomplish that purpose.

This brings us to a consideration of Mr. Cannon's application for reinstatement upon its merits irrespective of the legislative act. Mr. Cannon was suspended from practice until June 30, 1931, "and for such period thereafter as shall expire before his license to practice law is restored and he is reinstated as a member of the bar by this court, upon the presentation of proof that the expenses of this proceeding have been paid, and upon the further condition that he shall, before being reinstated, satisfy the court both by his conduct from this time forward and by assurances then given the court that he will not, if reinstated, be guilty of such conduct as that involved in the charges made in the complaint in this action."

At the time of the pronouncement of this judgment the court was of the opinion that Mr. Cannon's suspension for a period of two years would be adequate penalty for the charges upon which he was found guilty. He has suffered

that penalty and, therefore, expiated the particular offenses involved in his prosecution. However, the court, having in mind that one of the purposes in suspending an attorney from practice is to bring about a regeneration of character, provided that as a condition of his reinstatement he should satisfy the court both by his conduct from that time forward and by assurances then given the court that he will not if reinstated be guilty of such conduct as that involved in the charges made in the complaint in this action. The terms of this suspension therefore placed a burden upon him to thus satisfy the court. While the particular phraseology of the judgment of suspension is that he shall satisfy the court that he will not be "guilty of such conduct as that involved in the charges made in the complaint in this action," it is plainly our duty to take into consideration all of the facts and circumstances bearing upon the question of whether he is a proper person to be again invested with the privileges of an attorney at law.

The report of the Board of State Bar Commissioners made pursuant to our reference, is to the effect that at the time of the judgment of suspension and the entry of judgment for costs herein Mr. Cannon was able to pay and discharge said judgment, although at the present time he is unable to do so. They also report that during the period of his suspension he did not charge any judicial officer with criminal misconduct or immorality, but during said period, on numerous occasions, he did publicly charge members of the supreme court and certain circuit judges of Milwaukee county with malfeasance in office, which charges were made without any basis in fact therefor. This reference was made to the Board of State Bar Commissioners because of Mr. Cannon's persistent, consistent, and notorious attacks upon the courts of the state during the period of his suspension, and it was deemed proper to investigate the question as to whether such charges had any foundation in fact, and for the further pur-

pose of giving Mr. Cannon an opportunity to establish their truth. It appears from the proceedings had before the Board of State Bar Commissioners that Mr. Cannon now disclaims any intention or purpose of charging any judicial officers with any criminal misconduct or immorality, or any malfeasance in office. In the proceedings had before the Bar Commissioners, and in his application for reinstatement, he admits that he may have erred, that he did not at all times act calmly and dispassionately, that he did not follow the advice of his counsel, but is now convinced that he should have done so and gives assurance that if reinstated he will at all times endeavor to observe in good faith the code of ethics of the American Bar Association.

It is to be regretted that Mr. Cannon's attitude and conduct since his suspension raises a most serious question as to whether he is entitled to reinstatement. He did not accept the judgment of this court with that respect and obedience which becomes ordinary citizenship. He proceeded to make a public issue of the justice of his suspension, in pursuance of which he offered himself as a candidate for Justice of this court in the spring of 1930, and in 1931 became a candidate in opposition to Circuit Judge CHARLES L. AARONS, who was one of the three circuit judges who conducted the proceedings out of which grew the charges against Cannon resulting in his suspension. In these campaigns, and in other public utterances as well, he indulged in reckless and impetuous criticism of the courts of this state, which criticism was justified by no basis in fact. His remarks with reference to the courts have not been scrupulous, careful, or guarded. They have been most extravagant and, it is apparent, revengeful in character, and were founded more upon vague rumor or extravagant imagination than upon facts.

The right of Mr. Cannon to criticise the courts in his capacity as a private citizen cannot be challenged in this state. *State ex rel. Attorney General v. Circuit Court*, 97 Wis. 1,

72 N. W. 193. Here courts will not seek immunity from criticism by restraining the citizen or threatening the exercise of the right of free speech. In a democracy the best interest of society is promoted by according to the citizen the greatest freedom in the matter of discussing the relative qualifications of candidates for public office and of freely criticising any governmental department. He has a right to express his views upon the question of whether any governmental department is functioning in a manner to promote the general welfare. This freedom of discussion is important in order that the citizen may be advised concerning the affairs of his government and placed in the possession of facts which will enable him, with such discrimination as he may possess, to form intelligent conclusions.

The same power which created the other departments of the government created the courts. They are but governmental institutions set up for the service of society, and we can discover no ground upon which courts may protect themselves or their records from the freedom of discussion on the part of the citizens of the state. So Mr. Cannon as a private citizen had a perfect right to inveigh against the courts. In so doing he was in the exercise of the constitutional right of freedom of speech.

It may be remarked, here, however, that the cause of public welfare and the stability of government is illy served by stirring up unfounded prejudice against the courts. Their weaknesses and delinquencies are the proper subject of public comment. But comment along this line should be well founded and directed to the correction of abuses. In organized society some way must be provided for the settlement of controversies. This is necessary if we are to avoid the arbitrament of the sword and curb the strong in overpowering the weak. The members of society have become content to accept the decisions of courts in their controversies with their fellows, and they will remain content so long as they

have confidence in their courts. Restlessness, discontent, and anarchy, however, will result with the passing of confidence in the integrity of the courts, and stable government will totter upon its foundations. It is for this reason that high-minded citizens refrain from impetuous and ill-founded criticism of the courts. They realize that the stirring up of passion and prejudice against, and the inspiring of a lack of confidence in, the courts is an assault upon organized society. Of all the departments of government the courts are the least able to defend themselves against public attack. Society expects such strength and dignity on the part of judges and courts as will restrain them from the rough and tumble of public debate concerning their actions. The defense of the courts must be left to a fair and unbiased consideration of their own records by an intelligent public conscience. If there should be restraints upon the criticism of courts, such restraints should be moral in character, and proceed from a wide-spread and deep-seated conviction of propriety. The penalty for excessive or unjust criticism can be no more than that incurred by one who breaches any other social convention. It must proceed from the loss of respect which is accorded the offender by his fellows.

It is true that Mr. Cannon as a potential member of the bar was under restraint imposed by proprieties at least which do not rest upon the average citizen. In the first place, he took an oath to maintain the respect due to courts and judicial officers. This was the oath prescribed by the legislature to be taken by every one who should be admitted to the bar. The degree of respect due to courts and judicial officers is not easy to define. Courts have a right to compel obedience in certain cases, but it does not follow that they have a right to coerce any degree of respect. They are entitled to just such respect as the citizen sees fit to accord them. It is for those who bestow the respect, and not those upon whom it is bestowed, to set the limits of the respect to which courts are

entitled. It is entirely out of harmony with the spirit of democratic government for any creature of that government to coerce the respect of the citizen. But whatever may be the degree of that respect, Mr. Cannon took an oath to maintain the respect due to courts and judicial officers.

The legal profession throughout the years has come to a common understanding with reference to many of the proprieties which should obtain and be respected by the members of the bar. These standards of propriety generally recognized by the legal profession do not justify the reckless criticism of the courts indulged by Mr. Cannon. Here, again, however, we think the observance of these proprieties should be brought about rather by the moral influence of the bar itself than by coercion on the part of courts.

It is true that Mr. Cannon's campaign was a protest against the judgment of his suspension, and was conducted more for the purpose of a personal vindication than to promote the public welfare. A campaign of this sort is apt to lead to a perversion and distortion of facts, result in little of informative value to the voters, and constitute an appeal to prejudice and sympathy rather than to reason and justice. We take occasion at this time to express recognition of the right and good citizenship of an attorney who by his public utterances seeks to correct abuses, or what he believes to be abuses, on the part of the judiciary when he is prompted by considerations of public welfare. It is quite a different thing, however, when such a campaign is conducted by a lawyer who cares nothing about public welfare, but whose sole aim and ambition is self-vindication or glorification. We may set it down as a sound abstract proposition that the one is commendable and the other reprehensible. However, who is to say what the motives of such a campaign are? While the motives prompting the campaign of Mr. Cannon may not be difficult of definition, if courts assume to pass upon the motives of a campaign and to punish those who

prosecute such a campaign with improper motives, they will be entering upon a field where such a question will not always be so easy of decision. The result will be that all will hesitate to enter upon such a campaign because of the consequences which they may invite by reason of a misconstruction of their motives. Courts would be entering upon a dangerous field if they assumed to disbar attorneys because of criticism of courts based upon improper motives. It best conforms to the spirit of our institutions to permit every one to say what he will about courts, and leave the destiny of the courts to the good judgment of the people. They may err occasionally, but the combined sober judgment of the voters can be relied upon in the long run to protect the courts from calumny, abuse, and unfounded criticism. These considerations lead to the conclusion that Mr. Cannon cannot be refused reinstatement because of his indulgences in criticism of the courts, no matter how unfounded such criticism may have been.

The serious thing that we discover in reviewing Mr. Cannon's attitude is lack of character. That lack of character is revealed in part by his reckless and unfounded assertions concerning the courts. One of the traits which we expect to find in a lawyer is that of accuracy of statement. As one becomes seasoned in the practice of the law one gradually loses much of his natural propensity for reckless, extravagant, and unfounded declarations. He becomes more charitable in his views and fairer in his judgments. If courts rule against him he sees and appreciates the fact that such rulings are not wholly unsupported, or that they are not the result of ignorance or venality. He becomes more charitable, more just, more judicial in his contemplations.

Mr. Cannon has practiced law a sufficient length of time to lead one to expect greater exactitude in his statements and greater fidelity to the truth. Mr. Cannon possesses no little egotism, and it is apparent from his own admissions that his

conduct may be easily influenced by appeals to his vanity. He has been led into a self-appraisal to which perhaps he is not entitled by impartial judgment. This characteristic has led him into the obvious obsession that he is the victim of conspiracy on the part of corporations and insurance companies to drive him out of practice, in the consummation of which the conspirators have had the support of servile judges. He apparently blames the courts for the fact that many who he believes were more flagrant offenders than he have not suffered the punishment visited on him. It must be admitted that this attitude is not altogether strange to human nature, but, as an attorney, he should understand that many offenders escape punishment, and that courts are not charged with the responsibility of discovering the offenders. It is quite probable that many bootleggers escape punishment, but that cannot influence the court when one so charged is found guilty.

He admits in his petition that in pursuing his course of conduct he ignored the advice of his attorneys and yielded to the counsel of others apparently less qualified and less disposed to give impartial advice. This in itself betrays a weakness of character not generally commendable in attorneys at law. Having arrived at the conclusion that reinstatement cannot be refused solely upon the ground of his criticism of the courts, and that his attitude in his campaigns can only be considered in so far as it reflects his character, aside and apart from his disposition to criticise the courts, our consideration narrows down to a rather small compass. It must be conceded that he has many traits of character not commendable on the part of those who act as ministers of justice. We should give serious consideration to the question whether, as an original applicant for admission to the bar, these obvious weaknesses in Mr. Cannon's character should be overlooked. We think that under the circumstances he should not be subjected now to the same rigid

test that would be applied in the case of an original applicant. He has practiced law fourteen years. He has arrived at a time of life when it would be difficult for him to accommodate himself to any other means of livelihood. He has a family dependent upon him for support. He has suffered the penalty which the court imposed upon him for the offenses of which he was convicted. He has given assurances that he will henceforth be governed by the established ethics of the profession. His attorneys, who stand high in the regard of this court, are evidently convinced of the sincerity of his professions. The Governor, a lawyer of high ideals, in signing the act purporting to reinstate him, expressed the view that, while his conduct could not be approved, he had probably learned his lesson. The legislature, by the passage of the act purporting to restore him to practice, has at least manifested its belief in his fitness for the office. It must be that his experience has in some degree had a modifying influence upon his imperious attitude and impressed him with the necessity of obedience to constituted authority, and brought about some regeneration of character. Although the only evidence of such regeneration is to be found in his verbal assurances that he will henceforth demean himself in accordance with the ethics of the profession, we have concluded, somewhat doubtfully, we must confess, to give him another chance. We have concluded that he may be reinstated and placed in a position where he will have an opportunity to give substantial evidence of his professions, and thus justify the confidence reposed in him by his attorneys, the legislature, and the governor. Our action in this respect is accompanied by the hope that he will improve his opportunity to become an honorable and respected member of the bar.

But before he can be reinstated he must pay the judgment for costs which was assessed against him in the original case. While the act of the legislature purported to remit those

costs, this attempt was also plainly beyond the jurisdiction of the legislature as an unwarranted interference with the judgment of this court. To sustain this feature of the act, *Calkins v. State,* 21 Wis. *501, p. 508, is cited. That was a case where the state was a party to the litigation, and it was held that an act of the legislature authorizing the attorney general to enter into a stipulation to vacate and set aside the final judgment rendered in favor of the state ,so that a new trial might be had, was a valid enactment. That case grew out of contract rights. It was a case in which the proprietary interest of the state was involved. The court simply held it was competent for the state to consent to a new trial. While the judgment for costs in this case is to be paid into the state treasury, and in that sense the state has an interest in the proceeds, the question whether the legislature may donate them to a private individual is a question which we have not examined, although we may say we regard such power as exceedingly doubtful. *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 88 N. W. 596, 90 N. W. 1067. This judgment for costs was imposed on Mr. Cannon as a part of disciplinary punishment. It was a punishment expressly authorized by the statutes. The legislature can no more interfere with that punishment than it can interfere with any other judicial act, which, we have seen, is entirely beyond the scope of legislative power. We do not think Mr. Cannon should escape the payment of these costs. His conduct has not been such as to merit immunity from any portion of the judgment originally imposed.

*By the Court.*—Upon the payment of the judgment for costs rendered against Mr. Cannon in the original proceeding resulting in his suspension from practice, an order will be entered reinstating him as a member of the bar of this court.